OPINION OF THE COURT
Fuchsberg, J.
On this appeal in a suit brought by a bank to impose liability on two of its corporate customers and their officers, we are called upon to pass on issues involving (1) the inference, if any, a trier of the facts in a civil case may draw from a party’s assertion of his Fifth Amendment right to refuse to answer questions posed by his adversary; (2) the imputation of a bookkeeper’s knowledge of a fraudulent scheme to her corporate employer under the principles of the law of agency; (3) the procedures to be employed in moving to amend the pleadings to conform to the proof; and (4) alleged defects in a jury’s verdict in the context of a trial court’s direction that the jury not only return a general verdict but also supply written answers to interrogatories.
Defendant John E. Russo Produce Company, Inc. (Produce), and defendant-respondent Canestraro Produce, Inc. (Canestraro), are engaged in the wholesale and retail produce business in the City of Syracuse. If it be possible for two corporations to be closely related by blood as well as business, these are. Defendants John E. Russo and Rita Russo are the sole shareholders of Produce and the parents of defendant-respondents Joseph Russo and Andrew Russo, who control Canestraro. The firms had common offices and shared produce storage space in the Regional Market in Syracuse, and Canestraro was a principal supplier for Produce. In addition, Rita, the mother, was a salaried, part-time bookkeeper on Canestraro’s payroll, as well as an authorized signatory — along with *38 her sons Joseph and Andrew — on the checking account Canestraro maintained with plaintiff-appellant Marine Midland Bank.
The bank has accused the defendants of "check kiting”, a practice in which checks are drawn against deposits which have not yet cleared through the bank collection process (see Black’s Law Dictionary [5th ed], p 783). The specific transactions that led to this suit allegedly commenced in July of 1976. At that time Produce had checking accounts at Marine Midland and Citibank, both of which were set up on a "pay and refer” basis, under which any item that would create an overdraft in the account was not immediately dishonored, but held until the bank’s branch manager received assurances from Produce that an adequate deposit to cover had been made. If such assurances were forthcoming before the bank’s "midnight deadline” arrived (see, generally, David Graubart, Inc. v Bank Leumi Trust Co. of N. Y., 48 NY2d 554, 556-558), the item would be paid.
The purported kite had its genesis in Produce’s practice of covering its Marine Midland overdrafts by depositing checks drawn on its Citibank account. For its part, Canestraro, too, allegedly would, on occasion, cover overdrafts on its own account with a Produce Citibank check. The plot thickens with the detail that the Citibank account itself was often low on funds, a problem Produce would patch up by, in turn, giving Citibank a check drawn on its Marine Midland account. The essence of plaintiff’s contentions, then, is that Produce was banking on the lag time in the check collection process and did so successfully until January of 1977, when, Citibank having had occasion to dishonor several checks made out by Produce to itself, this checking house of cards collapsed. In the aftermath, Marine Midland, which had already paid out the items the Citibank checks were intended to cover, found itself with a deficit that had snowballed to $309,800.
This action for fraud and conversion followed. In the ensuing 21-day jury trial, as part of its own case Marine Midland called John and Rita Russo, in turn, to the stand. Upon the advice of their own counsel, and in light of an ongoing FBI investigation of the transactions, however, each invoked the privilege against .self incrimination when queried about whether he or she had signed any of the checks, had directed others to do so or had known there were then insufficient funds in the accounts to cover them. Over objection, the court *39 later charged the jury that no inference adverse to these defendants could be drawn from their refusal to answer.
Exception was also taken to the court’s failure to charge that the bank could recover on a theory of "money paid out by mistake”. In this connection, it is relevant, that though, as indicated, the pleadings asserted causes of action in fraud and conversion only, at the close of the bank’s case the court granted its unparticularized motion to conform the pleadings to the proof.
The verdict’s form also gave rise to controversy. Pursuant to CPLR 4111 (subd [c]), the jury had been directed not only to return a general verdict but also to supply written answers to 12 interrogatories, the first 10 of which were to specify whether each of the five remaining defendants[1] — John, Rita, Produce, Canestraro and Joseph — were liable, first in fraud and then in conversion. The eleventh inquired in what amount, if any, the jury determined that Marine Midland had been injured, and the last whether the bank’s claims had been satisfied by a demand note of Produce personally indorsed by John and Rita.
The answers to each of the first 10 interrogatories found the defendants free from liability, while the eleventh, in an answer the bank insists was inconsistent with the first 10, nevertheless fixed its loss at $309,800. The twelfth interrogatory went unanswered, and the clerk never inquired of the jury whether it had reached a general verdict.
When the jury announced these conclusions, and before it was discharged, the bank, in moving to set aside the verdict, in essence confined itself to arguing that the answers to the interrogatories were inconsistent with one another. It did not object to disbanding the jury. It was not until two days later, when Marine Midland tendered its formal postverdict motions under CPLR article 44, that it also contended that the jury should have been asked to clarify its answers and that the absence of a general verdict was a fatal defect. The Trial Judge denied the motions in their entirety.
However, the Appellate Division reversed the judgment in favor of John, Rita and Produce and ordered a new trial as to these defendants, primarily on the ground that the trial *40 court had erred in charging the jury that the invocation of the Fifth Amendment was not to be taken into account in weighing the evidence. On the other hand, the judgment was affirmed as to the Canestraro corporation and Joseph individually, the court finding that "there was sufficient evidence for the jury to conclude” that Rita performed only "mechanical” bookkeeping tasks for Canestraro and that, therefore, her awareness of the kite was not to be imputed to it or its managing officer[2] (65 AD2d, p 952). For the reasons that follow, we conclude that the bank is also entitled to a new trial against Canestraro.
We begin by observing that the trial court acted well within its power in posing the interrogatories it submitted to the jury. Doing so, it employed a technique especially well suited to cases with multiple parties and legal theories (see, e.g., Dore v Long Is. R. R. Co., 23 AD2d 502; cf. People v Piazza, 48 NY2d 151, 165).
Moreover, the options available to a Judge who has followed such a course, when confronted with apparent inconsistencies in a jury’s determinations under this hybridization of general and special verdicts, are controlled by CPLR 4111 (subd [c]). The design of this section was alleviation of injustices not infrequently produced by the prior ad hoc approach to inconsistent verdicts (see, generally, Kennard v Welded Tank & Constr. Co., 25 NY2d 324; Siegel, Supplementary Practice Commentaries [1969], McKinney’s Cons Laws of NY, Book 7B [Supplementary Pamphlet, 1964-1979], CPLR 4111, pp 85-86). In the main, it provides that, if a jury’s answers to interrogatories are consistent with one another, but one or more is in conflict with the general verdict, the court has discretion to order a new trial or require the jury to reconsider or enter judgment according to the answers. But, if answers are inconsistent with one another and one or more conflicts with a general verdict, the court’s alternatives are limited to ordering reconsideration or a new trial.
In terms of the case before us, while, of course, an explicit direction to the jury that it render its general verdict on the basis of its answers to the interrogatories might have been a wise precaution militating against inconsistency, Marine Midland’s challenge to the result is ultimately defeated in any *41 event on the threshold ground that the answers were in fact completely consistent. The jury unequivocally found no liability on the part of any defendant. And, its answer to question 11, while fixing the amount of the bank’s loss, was by no means to be taken as an allocation of responsibility to the defendants, an assumption that would have been at odds with the definitive determinations that preceded it.
Nor was the jury’s failure to report a general verdict fatal. Even if the bank had timely complained of its absence and a verdict adverse to the defendants had thereafter been pronounced, CPLR 4111 (subd [c]) would still have permitted the court to prefer the specific over the general by entering judgment in accordance with the answers the interrogatories had induced. Even more dispositively, we need not dwell on these hypotheses, for Marine Midland must be deemed to have waived its objections by failing to press them when it would have been possible to prevent or correct the "error”. For, as indicated earlier, the bank neither pointed out the probably inadvertent failure to state a general verdict on the record nor requested that the jury be instructed to reconsider the case before it was discharged and beyond recall.
Similarly unavailing to Marine Midland is its assertion that the court should have instructed the jury on the theory of money paid out by mistake. No retreat from the policy of liberality in allowing pleadings to be conformed to proof (see, e.g., Diemer v Diemer, 8 NY2d 206; Dittmar Explosives v A. E. Ottaviano, Inc., 20 NY2d 498) is sounded by our insistence that such a request — and any objection to its denial — be sufficiently focused to permit the Trial Judge and opposing parties to do more than guess at the precise nature of the change to be effected. In the case before us, plaintiff neither specified in what manner the proof varied from the pleadings nor suggested the alternative theories in its favor to which the defendants would now need to be alert. Rather, silence reigned supreme until the requests to charge were submitted, and very few decibels were registered when, after the jury had been instructed, plaintiff summarily and uninformatively asked that the court "charge in the language of what we [sic] requested and those requests which are not charged”. Surely, a court need not reroute the course of an entire trial without being given a chance to take a look at the pig in a poke it is being asked to buy. And, since there is to be a new trial, we add that the legal merits of such a cause of action will, we *42 assume, be delved into at nisi prius on a motion to amend made anew by the plaintiff, if it be so advised, in the context of whatever proof or offer of proof it then relies on.
This said, our concurrence in the rationales adopted by the Appellate Division ends when we turn to the court’s charge on the Fifth Amendment. Whether a jury in the context of a conventional civil case may be instructed to consider a party’s invocation of the privilege against self incrimination when called to the stand has not previously been addressed by this court. Nonetheless, rulings on closely related issues trace a well-marked path to the answer. So, we have long held that an attorney’s failure to testify in his own behalf in a disciplinary proceeding may count against him (Matter of Randel, 158 NY 216, 219; see, also, Matter of Gelman, 28 AD2d 1211), and we have even concluded that a grant of immunity coextensive with the privilege will not preclude the use of Grand Jury testimony in a disbarment proceeding (Matter of Anonymous Attorneys, 41 NY2d 506).
If the underlying policy of the privilege — to protect the individual from oppression at the hands of a State exercising its awesome powers of investigation to ferret out wrongdoing (see Baxter v Palmigiano, 425 US 308, 334-335 [Brennan, J., dissenting in part]) — may not shield one who is the target of a quasi-criminal disciplinary proceeding which may bring on the penalty of disbarment, simple logic leads to the conclusion that a like result would obtain in a purely civil case (cf. Lefkowitz v Turley, 414 US 70 [cancellation of government contracts]). That is certainly so here where the parties are on an equal footing and the only disadvantage threatened is liability to compensate an adversary for damages. We therefore decline to extend to civil cases a rule originally designed as a safeguard in criminal prosecutions (see, e.g., Griffin v California, 380 US 609; see, also, 8 Wigmore, Evidence [McNaughton rev, 1961], § 2272, subd [e], p 439, n 14).
Essentially, then, the issue becomes one akin to that arising when a party fails or refuses to produce a material witness who is within his control (see Richardson, Evidence [10th ed— Prince], § 534). It is now well established that such an event may be considered by a jury in assessing the strength of evidence offered by the opposite party on the issue which the witness was in a position to controvert (People v Rodriguez, 38 *43 NY2d 95, 101; cf. Matter of Cohen, 7 NY2d 488, 501, affd sub nom. Cohen v Hurley, 366 US 117, overruled on other grounds in Spevack v Klein, 385 US 511). Accordingly, we conclude that the court’s charge was in error.
In so ruling we are in agreement with the Appellate Division; our paths diverge, however, when we reach the question of how the trial court’s error affects Canestraro and Joseph Russo. The test for determining whether the erroneous instruction was harmless is not whether the jury might possibly have adopted a view of the facts that rendered it legally irrelevant — the thesis apparently propounded by the Appellate Division in concluding that there was sufficient evidence for the jury to say that Rita’s services for Canestraro were too ministerial to serve as a basis for imputing her knowledge of the scheme to it. The correct rule is that an error is only deemed harmless when there is no view of the evidence under which appellant could have prevailed (2A Weinstein-KornMiller, NY Civ Prac, par 2002.03, p 20-12).
That cannot be said to be true here as to Canestraro because its exculpation might have been based on the jury’s conclusion that Rita, who signed most of the checks, was unaware of the deficit balances in the accounts, a determination it might not have reached had there been a correct charge on the consequences of her assertion of her privilege against self incrimination.
Furthermore, no doctrinal obstacle bars Canestraro’s corporate liability as a matter of law. It is the bank’s position that this liability arises from Canestraro’s agents’ drawing of checks on its own account at Marine Midland with knowledge that the balance was composed in part of kited funds. It is fundamental that a knowing misrepresentation is an essential element of a cause of action for fraud (e.g., Jo Ann Homes v Dworetz, 25 NY2d 112, 119).
The means by which scienter may be imputed to Canestraro is crucial here, however. In general, the imputation of knowledge from agent to principal flows naturally from the assumption that the agent will live up to the duty to act in the principal’s interest in light of all the pertinent information he has acquired (see Restatement, Agency 2d, § 272, Comment a; Title Guar. & Trust Co. v Pam, 232 NY 441, 456-457; Corrigan v Bobbs-Merrill Co., 228 NY 58, 67-72). But this premise crumbles when the agent has an interest adverse to the purported principal. Then the knowledge of the agent acting *44 on his or her own behalf or on behalf of a second principal is not imputed to the first (Hartford Acc. & Ind. Co. v Walston & Co., 21 NY2d 219, 225-226; Reuschlein & Gregory, Agency & Partnership, § 62). While, in general, a bookkeeper responsible for the deposit of kited funds into her employer’s account would have a strong enough motive to conceal that fact for her interests to be deemed adverse to that of her principal, the relationship between the corporations and the individuals here was so close that we agree with the trial court that the existence of an informational barrier became an issue of fact. Accordingly, Marine Midland will again be. entitled to have the jury resolve the question at the new trial.
That does not mean that a factual determination that Rita’s interests were adverse to Canestraro’s would necessarily preclude the bank from seeking refuge in the equitable doctrine prohibiting unjust enrichment. A principal that accepts the benefits of its agent’s misdeeds is estopped to deny knowledge of the facts of which the agent was aware (Rockey Riv. Dev. Co. v German Amer. Brewing Co., 193 App Div 197; Restatement, Agency 2d, § 282, subd [2], par [c], Comment 1). Here, though Canestraro contends that it was not unjustly enriched because the funds it received from Produce were in consideration of goods actually sold to the latter, the intimate intertwining of the two firms combines with the permissible inferences that flow from Marine Midland’s analysis of Produce’s and Canestraro’s account books to raise factual questions that are not to be cavalierly ignored.
Joseph Russo’s individual liability is another matter. As a general proposition, corporate officers and directors are not liable for fraud unless they personally participate in the misrepresentation or have actual knowledge of it (see Lippman Packing Corp. v Rose, 203 Misc 1041; 12 NY Jur Rev, Corporations, § 803). Mere negligent failure to acquire knowledge of the falsehood is insufficient (Personal Liability of Officers or Directors of Corporation on Corporate Checks Issued Against Insufficient Funds, Ann., 47 ALR3d 1250, 1254; see Jones v Freeman’s Dairy, 283 App Div 806).
 Since the theory that Joseph actually knew of the misrepresentation was necessarily encompassed by the case as presented to the first jury, isolated as it was by the court’s submission of separate interrogatories as to his liability, the answers in his favor must be deemed a finding that he had no *45 such knowledge. If it were reasonable to conclude that this finding might have been induced by the jury’s misperception of the evidence under the guidance of the court’s erroneous charge, a reversal would, of course, be mandated. Such is not the case here, however, because there could have been no causal relationship between error and finding. Under proper instructions the jury would have been informed it could consider John’s and Rita’s refusals to answer in evaluating the other evidence against them. Since the privilege is personal to witnesses who assert it, they, and they alone, would have to bear the consequences of their own decisions (see Richardson, Evidence [10th ed — Prince], § 533). But, Joseph is immune from such a burden because he did not invoke the Fifth Amendment or direct his parents to do so (2 Wigmore, Evidence [Chadbourn rev, 1979], § 286, pp 199-201).
Moreover, John’s and Rita’s refusals were interposed to questions that essentially related to their personal knowledge of the kite. Since the fact that checks were drawn against artificially inflated balances was undenied and undeniable, it cannot be argued that the jury was misled into exculpating Joseph by an erroneous charge on an issue relating solely to the liability of other defendants in the case. While Joseph’s knowledge would have been sufficient to cast him in liability irrespective of the culpability of any other party, the jury having found as a fact — and the Appellate Division having since affirmed — that this prerequisite to his personal accountability for acts on behalf of the corporation he owned and managed was not met, it is now beyond our review (NY Const, art VI, § 3, subd a; Estate of Canale v Binghamton Amusement Co., 37 NY2d 875).
Accordingly, the order of the Appellate Division should be modified in accordance with this opinion and, as so modified, affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order modified, with costs to plaintiff against defendant Canestraro Produce, Inc., and to defendants Andrew and Joseph Russo against plaintiff, in accordance with the opinion herein and, as so modified, affirmed.

. The court dismissed the complaint as to Andrew for failure of proof, and the bank does not now argue that its case against Andrew was any stronger than that against Joseph, which is discussed infra.

. In addition, the court ruled that a cause of action in conversion did not lie against the defendants, a determination we have no occasion to review since Marine Midland does not challenge it.