**OLIN CORPORATION,**
**Plaintiff-Appellant,**

**v.**

**INSURANCE COMPANY OF NORTH AMERICA; American Home Assurance Company; American Reinsurance Company; Certain Underwriters at Lloyd's of London, England, Subscribing to Jewelers Block Policy No. JB 7904131 089; Commercial Union Insurance Company; Continental Casualty Company; Employers Insurance of Wausau a Mutual Company; Falcon Insurance Company (as successor to Employers' Surplus Lines Insurance Company); Federal Insurance Company; Fireman's Fund Insurance Company; Great American Insurance Company; The Home Insurance Company; Lexington Insurance Company; London & Edinburgh Insurance Company Limited; National American Insurance**

Company of New York (as successor to Stuyvesant Insurance Company); National Union Fire Insurance Company of Pittsburgh; North River Insurance Company; Northbrook Excess and Surplus Insurance Company; Transit Casualty Company, Defendants,

The Hanover Insurance Company (as successor to Massachusetts Bonding and Insurance Company), Defendant–Appellee.

No. 1119, Docket 91–9155.

United States Court of Appeals, Second Circuit.

Argued April 6, 1992.

Decided June 1, 1992.

James J. Harrington, New York City (Stephen A. Dvorkin, Michael L. Gioia, James J. Harrington & Associates, New York City, E. McIntosh Cover, Olin Corp., Stamford, Conn., of counsel), for plaintiff-appellant.

Dale C. Christensen, Jr., New York City (R. Scott Garley, Joseph E. Field, Seward & Kissel, of counsel), for defendant-appellee.

Before: FEINBERG, WINTER and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

Olin Corporation ("Olin") brought this action against its primary and excess insurance companies. Olin seeks the costs of its defense and indemnification for its losses in lawsuits that alleged that the chemical dichloro-diphenyl-trichloroethane ("DDT") was released from Olin's Huntsville, Alabama facility, causing various bodily injuries, as well as economic and property damage.

This appeal arises from Olin's action against the Hanover Insurance Company ("Hanover"), one of its primary insurers, based on comprehensive general liability ("CGL") policies issued by Hanover. Judge Sand entered partial summary judgment against Olin on the ground that Olin failed to provide timely notice to Hanover of the DDT–related occurrence as required by its Hanover policies. *Olin Corp. v. Insurance Co. of North America*, 762 F.Supp. 548, 565–66 (S.D.N.Y.1991). Judge Sand having entered a proper certification under Fed.R.Civ.P. 54(b), Olin appeals and we affirm.

## BACKGROUND

The facts are exhaustively recounted in Judge Sand's decision, with which we will assume familiarity. *See Olin Corp.*, 762 F.Supp. at 550–55. We need provide only a brief synopsis of the facts pertinent to the issue on this appeal.

In 1954, Olin purchased Calabama Chemical Company ("Calabama"), which manufactured DDT in a plant near Huntsville, Alabama. The land on which the plant was located was owned by the United States Army and was in an area known as the Redstone Arsenal. The record indicates that there was widespread knowledge, even before Olin bought Calabama, that DDT was leaking from the plant.

For example, as early as 1948, the manager of Calabama, Benton Wilcoxin, who remained as manager when Calabama was sold to Olin, discovered DDT settling out of the plant's waste water ditches. In 1952, the Army became concerned about chemical leakage from the Huntsville plant and therefore set maximum levels of DDT for its effluent. It also established a zero permissible level of DDT in the nearby Huntsville Spring Branch, into which the plant's drainage flowed. In the 1960s, Army testing of the site and of the Huntsville Spring Branch increased as a scientific consensus that DDT was dangerous to both humans and the environment emerged. In 1963, the Public Health Service also investigated the Huntsville situation. It released a series of reports documenting that the effluent from Olin's Huntsville plant contained toxic concentrations of DDT and that fish in the Huntsville Spring Branch, which was also polluted, were dying after exposure to the chemical.

Efforts by Olin to reduce the amount of DDT escaping from the Huntsville Plant failed. Testings of both the Olin effluent and the water in Huntsville Spring Branch continued to show DDT levels exceeding those set by the Army. The Army initiated procedures to shut down the Olin plant in August 1969 on the ground that Olin had violated its lease by causing DDT and other chemical pollution. After Olin made a final unsuccessful effort to correct the problem with a new filtering and settling system, the Huntsville plant finally closed on June 30, 1970. By the end of that year, the government had banned all DDT use except in specified emergencies.

In late 1978, the Tennessee Valley Authority released a study documenting high levels of DDT contamination in fish downstream from the old Olin plant. The next year the Center for Disease Control ("CDC") reported that residents of Triana, Alabama, a town situated downstream from the Olin facility, had high concentrations of DDT in their blood serum.

On July 9, 1979, thirty-two people from the commercial fishing industry filed suit against Olin and the Army, alleging that

the DDT pollution from the Huntsville plant had caused them both personal injuries and property damage. *See James v. Olin Corp.*, No. CA79 PT 5128NE (N.D.Ala. filed July 9, 1979). A few months later, the State of Alabama also filed suit against Olin. *See Alabama v. Olin Corp.*, No. CA79 G 5174NE (N.D.Ala. filed Sept. 10, 1979).

A more comprehensive CDC study was released in January 1980. It found unusually high DDT concentrations in Triana residents due to the nearby DDT manufactured by Olin. Soon after these results were published, two other suits were filed against Olin by Triana residents. *See Freeman v. Olin Corp.*, No. CV80 M 5057NE (N.D.Ala. filed March 14, 1980); *Parcus v. Olin Corp.*, No. CV80 M 5098NE (N.D.Ala. filed March 17, 1980). At this time, Olin notified two of its primary insurers, Insurance Company of North America ("INA") and Employers Insurance of Wausau ("Wausau"). The INA policies covered Olin from June 1, 1955 to January 1, 1974, and the Wausau policies covered Olin from January 1, 1974 to March 1, 1977. Olin claims that at the time it notified INA and Wausau, it was unaware of the existence of the Hanover policies.

In the following months, two more actions were filed against Olin. *See United States v. Olin Corp.*, No. CV80 PT 5300NE (N.D.Ala. filed Dec. 4, 1980); *Charest v. Olin Corp.*, No. CV 81 434P (Ala.Cir.Ct. filed Oct. 5, 1981). The *James, Freeman, Parcus* and *Charest* lawsuits were brought together on behalf of 1,200 people residing downstream from the Huntsville plant. They alleged that the plaintiffs had eaten fish and other wildlife and had drunk water contaminated with DDT from the Olin plant. Compensation was sought for economic loss and emotional and physical injuries.

On November 16, 1981, Olin gave Hanover notice of the DDT–related occurrence. In December 1982, Olin settled most of the lawsuits described above—styled by Olin the "first-wave" actions—agreeing to a $24

million payment to the plaintiffs over five years. As for the lawsuits brought by the State of Alabama and the federal government, Olin agreed to undertake remedial action at the Huntsville Spring Branch. In January 1983, these settlements were publicly announced.

After the $24 million settlement was announced, Olin was sued by numerous other plaintiffs—styled by Olin the "second-wave" actions—representing over 10,000 people who lived in areas more distant from Huntsville Spring Branch than the plaintiffs in the first-wave actions. Olin notified Hanover, along with its other primary insurers, of these DDT-related actions. After three years of discovery, these suits were also settled, at a cost to Olin of $15 million.

Olin filed the instant action in 1983 against three of its four primary insurance companies and a number of its excess insurance companies, from whom it (and its predecessor companies) had purchased liability insurance covering the period January 1, 1950 through March 1, 1977. Olin sought, *inter alia*, indemnity for the settlement from all the insurers and its costs of defense from the primary insurers, such as Hanover.

There were two CGL policies written by Hanover to cover Olin. The first was for the period from January 1, 1954 to January 1, 1955 and the second for January 1, 1955 to June 1, 1955 ("1954 and 1955 Hanover CGL policies"). Both policies contain the following conditions of coverage:

8. Notice of [Occurrence].[1] When an [occurrence] occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the [occurrence], the names and addresses of the injured and of available witnesses.

9. Notice of Claim or Suit. If claim is made or suit is brought against the in-

---

1. The word "occurrence" was substituted for the word "accident" pursuant to Endorsement Nos.

4 and 5 of the 1954 and 1955 Hanover CGL policies.

sured, the insured shall immediately forward to the company every demand, notice, summons of other process received by him or his representatives.

Endorsement No. 4 to the 1954 and 1955 Hanover CGL policies defines an "occurrence" for bodily injury as follows:

'Occurrence' means an event or continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy period. All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence.[2]

Olin thus owed Hanover two distinct notice obligations: (i) to provide notice of an occurrence as defined by the policies, and (ii) to provide notice of claims or suits filed.

The district court granted Hanover's motion for partial summary judgment on grounds of an untimely notice of occurrence. Judge Sand ruled that under both the 1954 and 1955 Hanover CGL policies, Olin's duty to provide notice to Hanover of the DDT-related occurrence accrued "at the latest" on the date the first lawsuit was filed—July 9, 1979. *Olin Corp.*, 762 F.Supp. at 566. Since Olin notified Hanover of the DDT-related occurrence two and a half years later, the district court found as a matter of law that Olin had failed to comply with the notice-of-occurrence conditions. *Id.* Judge Sand also held that Olin's proffered excuse for its delay in providing notice to Hanover—its inability to locate the Hanover insurance policies— was unsupported by the evidence. *Id.*

## DISCUSSION

Olin argues that the district court erred in granting summary judgment as to the so-called second-wave lawsuits filed after the first-wave settlement was announced in January 1983. As to the second-wave suits, Olin contends that its November 16, 1981 notice was timely because it could not reasonably anticipate the second-wave lawsuits. Essentially, Olin argues that be-

cause the first-wave plaintiffs lived closer to the Huntsville Spring Branch and had a higher percentage of DDT in their blood than the second-wave plaintiffs, Olin had no reason to anticipate lawsuits based on the more attenuated claims. Olin also renews its alternative argument that summary judgment was improperly granted as to all the lawsuits because its delay in notifying Hanover of the DDT occurrence should be excused as reasonable. Olin claims that despite prior diligent searches of its archives, it was unaware of the existence of the 1954 and 1955 Hanover CGL policies until it located them in November 1981.

### A. *Did Olin Raise the Second–Wave Claim in the District Court?*

██ Hanover argues that Olin is precluded from making its argument regarding the second-wave lawsuits because the argument was not timely raised in the district court. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 527 (2d Cir.1990) (generally, claims not raised in district court will not be addressed on appeal). In opposing Hanover's summary judgment motion, Olin did not make the specific argument regarding the second-wave suits. Rather it claimed that timely notice was given with regard to all the lawsuits. Olin raised the second-wave argument for the first time in a "motion for modification" filed two months after Judge Sand issued his opinion.

The district court correctly treated Olin's motion as a motion for reargument and denied it as untimely. *See* Local Civil Rule 3(j) (motions for reargument must be served within ten days of the court's docketing of its decision). Yet in denying the motion, Judge Sand also stated that even if timely, he would deny the motion as meritless since it "seeks to recanvass issues already decided by the court." Because Judge Sand viewed the first-wave/second-wave distinction as merely a new spin on

---

**2.** The definition of an "occurrence" for property damage is essentially the same as that for bodily damage except that the occurrence "results in injury to tangible property during the policy period." Endorsement No. 5 to the 1954 and 1955 Hanover CGL policies.

Olin's previous arguments, we will exercise our discretion to address it.

**B.** *When was Olin's Obligation to Notify Hanover of the Second–Wave Lawsuits Triggered?*

■ Olin agrees that New York law applies. Under New York law, an insured's failure to comply with a notice-of-occurrence provision is generally a complete defense even if the insurer was not prejudiced by the untimely notification. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118, 121 (2d Cir.1984). "[C]ompliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 271 (2d Cir.1987).

■ Notice-of-occurrence provisions allow insurance companies to make an early investigation into the particular circumstances of an occurrence, both as an aid to future litigation and as a means of ending or correcting dangerous conditions. Additionally, timely notice of occurrence assists insurers in estimating the amount of capital they need in reserve for future claims, and the amounts they must charge as premiums. Finally, these provisions aid insurers in the detection of fraudulent claims. *See id.; Utica Mutual,* 748 F.2d at 121; *Heydt Contracting Corp. v. American Assurance Co.,* 146 A.D.2d 497, 536 N.Y.S.2d 770, 772, *appeal dismissed,* 74 N.Y.2d 651, 542 N.Y.S.2d 520, 540 N.E.2d 715 (1989); *Power Authority v. Westinghouse Electric Corp.,* 117 A.D.2d 336, 502 N.Y.S.2d 420, 421–22 (1986).

In assessing an insurer's claim of an untimely notice of occurrence, "[t]he test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Commercial Union,* 822 F.2d at 272. Moreover, a policy stating that notice of an occurrence be given "as soon as practicable ... requires that notice be given within a reasonable time under all the circum-

stances." *Security Mut. Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 441, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972); *see also Power Authority,* 502 N.Y.S.2d at 422. In some cases, even short delays will render a notice untimely. *See, e.g., Deso v. London & Lancashire Indem. Co.,* 3 N.Y.2d 127, 130, 164 N.Y.S.2d 689, 143 N.E.2d 889 (1957) (fifty-one days); *Rushing v. Commercial Casualty Ins. Co.,* 251 N.Y.302, 304, 167 N.E. 450 (1929) (twenty-two days).

As noted, the first DDT-related lawsuit against Olin was filed on July 9, 1979. Yet it was not until November 16, 1981, two and a half years later, and twenty months after Olin had notified two of its other primary carriers, that Olin sent a notice of occurrence to Hanover. We agree with the district court that this delay was unreasonable as a matter of law and that Olin's obligation to provide notice of the Huntsville occurrence was triggered at the latest by July 9, 1979.

Because the 1954 and 1955 Hanover CGL policies define an "occurrence" as "an event or continuous or repeated exposure to conditions, which unexpectedly causes injury," there cannot be an occurrence, Olin argues, until the policyholder has learned of a relevant injury. Olin thus takes the position that the leaking of DDT from the Huntsville plant was not an "occurrence" within the meaning of the 1954 and 1955 Hanover CGL policies. Olin argues that its awareness of the first-wave claims did not give it reason to expect future lawsuits filed by the second-wave claimants, who lived in areas more remote from the Huntsville Spring Branch than the first-wave claimants. Since it was supposedly unaware of any second-wave injuries until the first second-wave claim was filed in 1983, Olin argues that the notice-of-occurrence obligation was not triggered until then. We disagree.

Olin correctly describes the governing law as requiring an injury, or colorable claim thereof, in order for an event to constitute an occurrence under an insurance policy. However, it does not follow that an insured is obligated to provide the

insurer notice of an occurrence only when it learns of a particular identified injury. Under the Hanover policies, an occurrence is defined as "an event or continuous ... exposure to conditions, which unexpectedly causes injury." However, "[a]ll such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence." Under this definition, the DDT leakage from the Huntsville plant constituted an occurrence once Olin had sufficient information reasonably to apprehend that a colorable claim of injury resulting from the DDT leakage might be made. The Hanover notice-of-occurrence condition required that Olin provide Hanover not only with information regarding particular identified claims but also with information concerning exposure to "the same general conditions," such as the DDT contamination of the Huntsville Spring Branch.

Judge Sand was thus correct, indeed quite generous to Olin, in finding that Olin's duty to provide notice accrued at the latest on July 9, 1979, the day that the first DDT-related lawsuit was filed against Olin. The filing of that suit would have "*suggested* to a reasonable person the *possibility* of [other] claim[s]," *Commercial Union*, 822 F.2d at 272 (emphasis added), and would surely have alerted a reasonable person to suspect that other claims by varied plaintiffs with more attenuated injuries might follow. Olin's argument that the filing of the first-wave claims was not enough to cause it to apprehend future but weaker claims simply does not wash. The existence of the first wave claims made the second-wave claims inevitable. Indeed, many of the latter were filed immediately after the January 1983 first-wave settlement, strongly suggesting that the timing of filing was tactical and that the second-wave actions had been prepared some time earlier. Olin's second-wave argument thus disregards the reality surrounding the bringing of tort claims.

## C. *Is Olin Excused for the Delay in the Notice of Occurrence?*

■ "An insured's failure to give timely notice to its insurer may be excused ... by proof that the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability." *Id.* at 271 (citing *Security Mut. Ins.*, 31 N.Y.2d at 441, 340 N.Y.S.2d 902, 293 N.E.2d 76). Generally, the question of whether a delay is excusable is a question of fact for the jury, but of course a delay may be unreasonable as a matter of law when either no excuse is advanced or a proffered excuse is meritless. *Public Serv. Mut. Ins. Co. v. Levy*, 87 Misc.2d 924, 387 N.Y.S.2d 962, 965 (Sup.Ct.1976), *aff'd*, 57 A.D.2d 794, 395 N.Y.S.2d 1 (1977). Moreover, the insured bears the burden of proving that the delay in notifying an insurance company was excusable.

Olin has offered no evidence in support of its claim that the delay was excusable. First, Olin has no colorable claim that as of July 1979, when the first DDT-related lawsuit was filed against it, it "lacked knowledge of the occurrence." Overwhelming evidence indicates that Olin knew of the DDT contamination flowing from its Huntsville plant and of health concerns about DDT for years prior to 1979. Indeed, it was forced to close the Huntsville plant in 1970. Moreover, as of July 1979, Olin could not possibly have harbored "a reasonable belief of nonliability."

The only excuse proffered by Olin that survives our rejection of Olin's first-wave/second-wave distinction, therefore, is its purported failure to discover the 1954 and 1955 Hanover CGL policies until November 1981. Olin argues that it complied with the notice-of-occurrence provision because it afforded Hanover notice, as provided in the policies, "as soon as practicable" under the circumstances.

■ We disagree. This long delay in notification is inexcusable as a matter of law. Even assuming that Olin did not locate the Hanover policies until November 1981, a lack of knowledge of an insurance policy does not excuse a delay in notification of an occurrence. It is true that "delay ... may be excused if there was a justifiable lack of knowledge of coverage." *Scala v. Scala*, 19 A.D.2d 559, 241

N.Y.S.2d 23, 24 (1963). A justifiable lack of knowledge of coverage, however, is to be distinguished from a lack of knowledge of the existence of a policy. Notice of the content of coverage is within the control of an insurer, and it will thus generally bear some of the responsibility for an insured's lack of knowledge of coverage. *See, e.g., Padavan v. Clemente,* 43 A.D.2d 729, 350 N.Y.S.2d 694, 696 (1973) (insurance company's failure to explain coverage provision of policy to insured led to finding that insured's seven-month delay in giving notice was excusable). An insurer has no power over an insured's retention of a policy, however, and bears none of the responsibility for an insured's loss of a policy. That being the case, we believe that it is the responsibility of the insured, not the insurance company, to keep track of which carriers have provided it with liability insurance. Although toxic torts may expose insurers to liability founded on acts that occurred decades before and cause their loss reserves to be inadequate, we see no reason to increase that burden by allowing insureds to give late notice because they lost the relevant policies.

We therefore affirm the district court's granting of partial summary judgment to Hanover.