Russell **MARTINSON** and Josephine **Martinson, Individually and Formerly Doing Business As Apple Valley Norgetown, A/K/A Apple Valley Norgetown Laundromat, A/K/A Apple Valley Laundromat, Plaintiffs,**

v.

**MASSACHUSETTS BAY INSURANCE COMPANY, Defendant.**

**No. 95 Civ. 5099 (DC).**

United States District Court, S.D. New York.

Dec. 6, 1996.

Dickstein Shapiro Morin & Oshinsky L.L.P. by Stephen A. Dvorkin, David L. Elkind, Maura J. Condon, New York City, for Plaintiffs.

Law Office of Roy A. Mura by Roy A. Mura, Buffalo, NY, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this insurance coverage case, plaintiffs Russell and Josephine Martinson (the "Martinsons") allege that defendant Massachusetts Bay Insurance Company ("MBIC") is obligated to defend them in an action entitled *Klein v. Grand Union Co. et al.*, No. 91 Civ. 8495 (S.D.N.Y. Dec. 1991) (the *"Klein* action"). The Martinsons seek this coverage pursuant to several Comprehensive General Liability ("CGL") policies sold to the Martinsons and issued by MBIC (the "MBIC policies"). The Martinsons have now moved for partial summary judgment on the issue of whether MBIC has a duty to defend them in the *Klein* action. For the following reasons, the Martinsons' motion for partial summary judgment is denied. Additionally, because the undisputed facts in this case establish that, as a matter of law, the Martinsons failed to give timely notice of the *Klein* action to MBIC as required under the policy language, I hold that MBIC properly denied coverage. Accordingly, summary judgment is granted in favor of MBIC and the complaint is dismissed.

## BACKGROUND

The Martinsons were the owners of the Apple Valley Norgetown Laundromat (the "Laundromat") located at the Apple Valley Shopping Center (the "Shopping Center") in LaGrange, New York from 1981 until 1995.

(Mura Aff. ¶ 15 & Ex. D). The Shopping Center is a small strip mall owned by James Klein Enterprises ("Klein"). From 1981 until 1993, the Martinsons were covered for liability arising out of the operation of the Laundromat by several CGL policies issued by three different insurance companies. From 1983 to 1988, the CGL policies covering the Martinsons were issued by MBIC. (Mura Aff.Ex. M). From 1988 to 1989, and again from 1990 to 1993, the policies were issued by Mid–Hudson Cooperative Insurance Company ("Mid–Hudson"). (*Id.*). Finally, from 1989 to 1990, the Martinsons were covered by a CGL policy issued by the Warwick Insurance Company ("Warwick"). (*Id.*).

The Laundromat had one self-service dry cleaning machine for use by its customers in which the chemical perchlorethylene ("PCE") was used. (Mura Aff.Ex. F). Beginning in 1981, the Martinsons disposed of filters from the self-service machine containing PCE by wrapping them in garbage bags and placing them in a dumpster outside of the Shopping Center. (*Id.*). This practice was carried on for approximately ten years. However, on March 13, 1991, pursuant to an agreement with the EPA, the Martinsons ceased this practice and retained a professional waste-disposal company to dispose of the PCE. (*Id.*).

During early 1991, the United States Environmental Protection Agency (the "EPA") undertook an investigation of the property at the Shopping Center in response to concerns that pollutants had been leaked into the water supply at that location. In March 1991, the EPA wrote to the Martinsons explaining the nature of its investigation and requesting certain information about the operations of the Laundromat. (Mura Aff.Ex. E). On May 13, 1991, the EPA again wrote to the Martinsons, this time putting them on notice that they were considered "Potentially Responsible Parties" and might be liable for the cost of the investigation and cleanup at the Shopping Center (the "EPA claim"). (Mura Aff.Ex. G). In the letter, the EPA stated that it believed the Martinsons were the owners of the Laundromat "at the time of the release of hazardous substances there."

(*Id.*). The only hazardous substance the Martinsons had at the laundromat was PCE. (Martinson Aff.Ex. 1).

On May 16, 1991, the Martinsons received a letter from Klein's attorney, David Engel, putting them on notice that Klein also intended to hold the Martinsons (as well as others) liable for the contamination at the Shopping Center and for any costs incurred by Klein as a result of that contamination (the "Klein claim"). (Mura Aff.Ex. H). In the letter, Engel stated that environmental experts hired by Klein had determined that dry cleaning solvents had been released at the Shopping Center and that these were in fact the "hazardous substances" the EPA had found in the drinking water at the location. (*Id.*).

On May 29, 1991, in response to the EPA and Klein letters, the Martinsons' attorney, Jay Rolison, wrote to Michael Mangi, of Michael Mangi & Son Agency, Inc. ("Mangi"), the insurance agent through whom the Martinsons had obtained insurance coverage for the Laundromat. (Mura Aff.Ex. B). In the letter, Rolison directed Mangi to put the Martinsons' then-current insurance carrier, Mid–Hudson, on notice of the claims by the EPA and Klein. (Rolison Aff.Ex. 2). The letter, however, did not ask Mangi to notify either MBIC or Warwick. Moreover, Rolison has admitted that he only intended for Mangi to notify Mid–Hudson and did not intend to put MBIC on notice by the letter. (Mura Aff.Ex. B).

In December 1991, Klein commenced an action against the Martinsons and others seeking to recover cleanup costs that Klein allegedly incurred and expected to incur as a result of the release of hazardous substances, including PCE, at the Shopping Center. (Rolison Aff.Ex. 1). That action is currently pending in the Southern District of New York before Judge Brieant. On January 3, 1992, Rolison again wrote to Mangi directing it to put Mid–Hudson on notice of the *Klein* action. (Rolison Aff.Ex. 3). As with the May 29, 1991 notice letter, this letter also did not direct Mangi to put MBIC or Warwick on notice and Rolison did not intend that it do so. (Mura Aff.Ex. B)

On January 29, 1993, during the course of discovery in the *Klein* action, the Martinsons' attorney sent a letter to Mangi and for the first time requested that Mangi notify MBIC of the *Klein* action. (Mura Aff.Ex. N). This letter came almost fourteen months after the *Klein* action was commenced. The Martinsons allege that this was the first time it became apparent that the MBIC policies might be implicated. (Pl.Mem. at 7). On April 14, 1993, MBIC issued a denial and disclaimer of coverage letter and refused to pay for or provide a defense for the *Klein* action. (Mura Aff.Ex. O). The basis for the denial and disclaimer was, *inter alia,* late notice of the EPA claim and the *Klein* action. (*Id.*).

After MBIC denied coverage, the Martinsons instituted this action. In their first claim for relief, the Martinsons seek damages resulting from MBIC's alleged breach of contract. In their second claim, they seek a declaration that MBIC must defend them in the *Klein* action. The Martinsons now move for summary judgment on their second claim for relief.

## DISCUSSION

### A. Standards for Summary Judgment

█ Although defendant has not crossmoved for summary judgment, this Court nevertheless has the power to grant summary judgment in defendant's favor sua sponte. *Lowenschuss v. Kane,* 520 F.2d 255, 261 (2d Cir.1975); *Siderius, Inc. v. M.V. "Ida Prima",* 613 F.Supp. 916, 923 (S.D.N.Y.1985); *see* 10A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2720, at 29–30 (2d ed. 1983) ("[T]he weight of authority is that summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion under Rule 56."). On the basis of the documentary evidence and plaintiffs' own admissions, plaintiffs' motion must be denied and summary judgment must be granted in favor of defendant.

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to

judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* at 255, 106 S.Ct. at 2513–14 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in the party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. As the Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). With these standards in mind, I have reviewed the record as if defendant had moved for summary judgment and plaintiffs were opposing.

**B.** *Notice*

■ Notice provisions—or provisions requiring insureds to give timely notice to the insurer of potential claims—serve three purposes. First, they allow the insurer to properly and adequately investigate and respond to claims. Ostrager & Newman, Handbook On Insurance Coverage Disputes, § 4.02[a], at 91 (8th ed. 1995) (hereinafter "Insurance Coverage Disputes"); *Olin Corp. v. Insurance Co. of North America*, 966 F.2d 718, 723 (2d Cir.1992). Second, such provisions also serve as an aid to insurers allowing them to end or correct dangerous conditions. *Olin*, 966 F.2d at 723. Third, notice provisions allow insurers to estimate the amount of capital they need in reserve for future claims and aid in the detection of fraud. *Id.*; Insurance Coverage Disputes, § 4.02[a], at 91.

■ Under New York law, an insured's failure to comply with a notice-of-claim provision is generally a complete defense to actions against the insurer for coverage. *Olin*, 966 F.2d at 723; *see also Utica Mutual Ins. Co. v. Fireman's Fund Ins. Co.*, 748 F.2d 118, 121 (2d Cir.1984). This holds true even if the insurer was not prejudiced by the untimely notification. *Olin*, 966 F.2d at 723. "[C]ompliance with a notice ... provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir.1987).

The Martinsons allege that they provided timely notice of the *Klein* action as was required by the MBIC policies.[1] The Martinsons base their claim on two alternate arguments. First, they argue that the notice letters sent to Mangi in 1991 and 1992 directing Mangi to notify Mid–Hudson of the EPA claim and the *Klein* action were sufficient to put MBIC on notice because Mangi was allegedly an agent of MBIC. Second, the Martinsons argue that they were unaware that the claims in the *Klein* action might implicate the MBIC policies until January 1993. Thus,

---

1. The MBIC policies stated:

 Insured's duties in the event of occurrence, claim or suit.

 . . . . .

 B. If a claim is made or suit is brought against the insured, the insured shall *immediately* forward to the company every demand, notice, summons or other process received by him or his representative.

 (Rolison Aff. Ex. 5) (emphasis added). It should also be noted that the MBIC policies are "occur-

rence" policies. An occurrence policy provides coverage for any "occurrence" that takes place during the policy period. Insurance Coverage Disputes, § 8.03[a], at 316. Under these types of policies, it is irrelevant whether the resulting claim is brought by the insured during or after the policy period, as long as the injury causing event happens during the policy period. *Id.* This is the opposite of a "claims-made" policy, which only covers liability if a claim is asserted during the policy period. *Id.*, § 4.02[b], at 96.

they assert that their notice to MBIC, through Mangi, in January 1993 was timely under New York Law.

### 1. *Letters to Mangi Did Not Provide Notice to MBIC*

The Martinsons claim that the letter they sent to Mangi on May 29, 1991, notifying him of the claims by the EPA and Klein, and the letter they sent to Mangi on January 3, 1992, notifying him of the *Klein* action (collectively the "notice letters"), served as notice to MBIC. The Martinsons allege that Mangi was "the agent for, *inter alia*, Massachusetts Bay," and was authorized to accept notice for MBIC. (Pl.Mem. at 6). According to the Martinsons, the notice letters sent to Mangi satisfied their obligation under the MBIC policies to provide notice of claims to MBIC even though the letters "specified only the Martinsons' then-current insurance policies [with Mid–Hudson]." (Pl.Mem. at 16). The Martinsons' argument, however, is flawed for two reasons.

■ First, it is clear, based on the affidavits and exhibits submitted with this motion, that a reasonable jury could only conclude that at the time the notice letters were sent to Mangi he was no longer an agent for MBIC. By his own admission, Mangi was an agent for MBIC only "[f]rom June 7, 1979 until January 1, 1988." (Mangi Aff. at 1). The Martinsons sent the notice letters to Mangi in May 1991 and January 1992—at which time it is undisputed that Mangi was no longer an agent for MBIC. Therefore, New York agency law does not apply to this situation, and the notice given to Mangi could not be imputed to MBIC.

■ Second, even assuming that Mangi continued to be MBIC's agent for the purpose of receiving notice with respect to the MBIC policies, the Martinsons' "agency theory" argument still fails. The Martinsons claim that sending Mangi a letter specifically directing him to put Mid–Hudson on notice was sufficient to put each of their insurance companies on notice because Mangi was purportedly also the agent of those other companies. I disagree.

■ Under New York law, "[i]t is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal." *Farr v. Newman,* 14 N.Y.2d 183, 250 N.Y.S.2d 272, 275, 199 N.E.2d 369, 372 (1964). This principle flows from "the assumption that the agent will live up to the duty to act in the principal's interest in light of all the pertinent information [the agent] has acquired." *Marine Midland Bank v. Russo Produce Corp.,* 50 N.Y.2d 31, 427 N.Y.S.2d 961, 968, 405 N.E.2d 205, 210 (1980).

■ Based on these principles, the Martinsons argue that Mangi's knowledge of the EPA claim and the *Klein* action must be imputed to MBIC because Mangi was the "Massachusetts' Bay agent." The Martinsons' reliance on those principles, however, is misplaced. Although a principal is generally bound by notice given to his agent, this is not true when the person giving notice had no expectation that it would be transmitted to the principal or the agent was not acting as an agent at the time the notice was received. *Corporacion de Mercadeo Agricola v. Mellon Bank,* 608 F.2d 43, 46 (1979) ("Notice to the agent . . . is notice to the principal *unless* the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal."). On the present motion, therefore, what must be determined is whether a genuine issue of fact exists as to whether the Martinsons had reason to know that Mangi had no duty to or would not transmit notice to MBIC.

When the Martinsons sent the May 29, 1991 notice letter to Mangi, it is clear, that as a result of their own actions, Mangi was acting only as a Mid–Hudson agent. Therefore, when notice was given to Mangi he was not acting within the scope of his agency with MBIC. Not only did the letter give no indication that MBIC should be notified (by, for example, alluding to the years covered by MBIC policies) but instead it *specifically* instructed Mangi to notify Mid–Hudson only. In fact, Rolison admitted that he had no intention of putting MBIC on notice when he sent the notice letters to Mangi. Thus, the

Martinsons could have no expectation that Mangi would notify MBIC and so Mangi's knowledge could not be imputed to MBIC. Accordingly, I hold that the notice letters could not, and did not, serve to put MBIC on notice. On the indisputable facts, including the testimony of the Martinsons' own attorney, no reasonable jury could find otherwise.

### 2. *Notice to MBIC in January 1993 Was Not Timely*

The Martinsons argue, in the alternative, that the notice they provided to MBIC in January 1993 "independently satisfie[d their] notice obligations" to MBIC. (Pl. Mem. at 17). The Martinsons allege that it was not until January 1993, during the course of discovery, that they first learned the plaintiff in the *Klein* action was claiming that property damage had taken place during the periods of the MBIC policies. (*Id.*). They assert that the notice provided to MBIC immediately following this alleged discovery satisfied their obligation under the MBIC policy to "immediately" notify MBIC of any claim implicating the policy. I disagree.

The MBIC policy required the Martinsons to provide notice of a claim to MBIC "immediately." (Rolison Aff.Ex. 5). This means that the Martinsons were required to notify MBIC "once the circumstances known to [them] at the time would have suggested to a reasonable person the possibility of a claim [against MBIC]." *Asbeka Indus. v. Travelers Indem. Co.,* 831 F.Supp. 74, 82 (E.D.N.Y.1993) (quoting *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 272 (2d Cir.1987)). The notice had to be given "within a reasonable time considering all the circumstances." *Avondale,* 774 F.Supp. at 1430.

The Martinsons allege that under the circumstances of this case, it was reasonable for them to have failed to realize until two years after the claims by the EPA and Klein were made, and almost fourteen months after the *Klein* action was commenced, that those claims implicated the MBIC policies. However, on the basis of the facts offered by the Martinsons themselves, this argument is plainly untenable.

On May 13, 1991, the EPA wrote to the Martinsons informing them that they were "Potentially Responsible Parties" for the costs of the investigation and cleanup of the contamination at the Shopping Center. While the EPA, in its letter, did not denote the years during which it sought damages, it did indicate the actions it believed led to the contamination. For example, the EPA states in its letter "[w]e also have reason to believe that you were owners ... [of the laundromat] at the time of the disposal of hazardous substances there." (Mura Aff.Ex. G). By their own admission, the Martinsons had been dumping PCE into a dumpster behind the laundromat from 1981 until 1991. It is clear that this practice is the "disposal of hazardous substances" referred to in the EPA letter. Therefore, the Martinsons should have been aware at this point that policies issued during those years, including the six MBIC policies issued from 1983–1988, might be implicated and that carriers for that period should be notified. Even assuming that the Martinsons were not aware, as they contend, of the possibility the MBIC policies could be implicated, the inquiry is an objective one. Objectively, a reasonable policyholder surely would have been aware of this possibility, and no reasonable jury could hold to the contrary.

Similarly, the letter received from Klein's attorney in May 1991 putting the Martinsons on notice of Klein's claim against them indicated an intent to hold the Martinsons responsible for the cleanup of contamination at the shopping center. The letter specifically stated that Klein's experts had determined that dry cleaning solvents had been released into the soil at the Shopping Center, and that it was this solvent that the EPA had detected in the contaminated drinking water. Again, since the Martinsons carried on the practice of dumping PCE into the dumpster from 1981 to 1991, it was not reasonable for the Martinsons to conclude that only their current insurance carrier needed to be notified of the claims made by Klein.

Furthermore, in October 1991, the Martinsons received a report from U.S. Hydrogeologic, Inc., the company they had hired to

run independent tests to determine the extent and possible sources of contamination at the Shopping Center. (*See* Mura Aff.Ex. C). According to the report, traces of PCE were detected in the soil around the ·dumpster behind the Laundromat. (*Id.* at 6). The report further indicated that the contamination in the soil was possibly the result of the disposal practices carried on by the Martinsons. (*Id.*). Because the Martinsons were made aware that they might be liable for a practice they knew they had carried on from 1981 to 1991, it was not reasonable at that point for the Martinsons to conclude that they were only required to notify the carrier that had issued the policy then in effect.

Finally, in January 1993, the Martinsons received the amended complaint in the *Klein* action (the "*Klein* complaint"). In his affidavit, Rolison states that the Klein complaint did not specify the years for which it was seeking damages and that the alleged damages occurred as a result of the release of "unspecified substances." This statement, however, is only half true. While the Klein complaint did not mention the years during which damages were sought, it did discuss the release of PCE. Specifically, the complaint alleged that Klein had been damaged as a result of the negligent "disposal of hazardous substances" including PCE. (Amd. Cplt. ¶¶ 77–78). Once again, the Martinsons had been put on notice that their alleged liability in this matter was directly related to their disposal of PCE into the dumpster from 1981 to 1991—a time period for at least part of which they were insured by MBIC.

Thus, before they even received the *Klein* complaint, the Martinsons and their attorneys received three separate notifications that they might be held liable for damages resulting from the improper disposal of PCE at· the shopping center. Any one of these should have alerted the Martinsons that MBIC had to be notified. However, when these notifications are viewed along with the allegations in the *Klein* complaint, it becomes crystal clear that Klein was seeking damages for practices carried on by the Martinsons during the time period the MBIC policies were in effect.

Thus, while the Martinsons are correct in asserting that the *Klein* complaint did not explicitly allege the years for which it sought damages, that assertion is irrelevant. The standard applied in determining whether notice was given timely is an objective one and does not rely on the subjective knowledge of the Martinsons or their counsel. The Martinsons may not simply ignore ·the obvious and then plead ignorance. Instead, what must be determined is whether the letters from the EPA and Klein's attorney, the report from Hydrogeologic, and the *Klein* complaint, when viewed together, "would have suggested to a reasonable person the possibility of a claim" against MBIC. The answer, as a matter of law, is clearly yes.

 Thus, the Martinsons' duty to "immediately" notify MBIC of a claim arose no later than December 1991 when they received the *Klein* complaint. Because the Martinsons did not notify MBIC of the *Klein* action until January 29, 1993—approximately fourteen months after it was commenced— notice was not provided in a timely fashion. *See American Ins. Co.*, 56 F.3d at 438 ("Under New York law, delays for one to two months are routinely held 'unreasonable.'"). Hence, MBIC has no duty to defend or indemnify the Martinsons in the *Klein* action.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment is denied. Additionally, because the undisputed facts in this case establish that, as a matter of law, the Martinsons failed to give timely notice of the *Klein* action to MBIC as required under the policy language, I hold that MBIC properly denied coverage. Accordingly, summary judgment is granted in favor of MBIC and the complaint is dismissed with prejudice and with costs.

SO ORDERED.