CATHAY PACIFIC AIRWAYS, LTD., Plaintiff,

v.

FLY AND SEE TRAVEL, INC.; Chaim Werdyger, Defendants.

HAWAIIAN AIRLINES, INC., Plaintiff,

v.

FLY AND SEE TRAVEL, INC.; Chaim Werdyger, Defendants.

Garuda INDONESIA, Plaintiff,

v.

FLY AND SEE TRAVEL, INC.; Chaim Werdyger, Defendants.

Nos. 90 Civ. 0371(JES), 90 Civ. 0372(JES) and 90 Civ. 5049(JES).

United States District Court, S.D. New York.

May 5, 1998.

---

Stuart R. Singer, New York City, David A. Robinson, of counsel, for plaintiffs Cathay Pacific Airways, Ltd., Hawaiian Airlines, Inc., and Garuda Indonesia.

Vivian Shevitz, Mount Kisco, NY, Steven A. Rosen, of counsel, for defendants Fly & See Travel, Inc., and Chaim Werdyger.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiffs Cathay Pacific Airways, Ltd. ("Cathay"), Hawaiian Airlines, Inc. ("Hawaiian"), and Garuda Indonesia ("Garuda") bring the above-captioned related actions against defendants Fly and See Travel, Inc. ("Fly & See") and Chaim Werdyger ("Werdyger"), each claiming violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(1), (4), (5), 1962(a)–(c), common law fraud, breach of contract, breach of agency, unjust enrichment, conversion, and New York General Business Law § 158.

The three above-captioned actions were consolidated for a bifurcated bench trial. Following trial on the issue of liability, the Court found defendants liable under RICO. *See* Trial Transcript dated March 13, 1992 ("March 3, 1992 Tr.") at 45; Trial Transcript dated April 3, 1992 ("Apr. 3, 1992 Tr.") at 6. Thereafter, the Court heard testimony on the issue of damages. For the reasons set forth below, the Court finds that plaintiffs have failed to establish their out-of-pocket losses and that defendants' cross-bordering practice was the proximate cause of their damages.

## BACKGROUND

### I. The Fraud

Cathay, Hawaiian, and Garuda are airline carriers that contracted with the Airline Reporting Corporation ("ARC"), a financial clearinghouse that facilitates transactions between airline carriers and travel agencies.

*See* Defendants' Post–Trial Memorandum dated February 15, 1992 ("Defs.' Post–Trial Mem.") at 1. In 1987, acting as agent for the carriers, the ARC entered into an Agent Reporting Agreement ("the Agreement") with Fly & See, a travel agency. *Id.* Pursuant to the Agreement, Fly & See was authorized to issue airline tickets on behalf of plaintiffs. *See* Joint Pre–Trial Order dated October 29, 1991 ("PTO"), ¶ 5(a)(2). Fly & See was, at all relevant times, owned, operated, and controlled by Werdyger. *See* PTO ¶ 5(a)(1).

At trial on the issue of liability, the Court found that Fly & See and Werdyger had engaged in the practice of "cross-bordering," whereby a travel agent issues an airline ticket with a false point of travel origin, usually a country with soft currency from which the passenger never actually intended to commence his air travel. *See* Trial Transcript dated November 4–5, 1991 ("Nov. 4–5, 1991 Tr.") at 45–46, 76, 154–55, 176–77; Apr. 3, 1992 Tr. at 25. The purpose and effect of cross-bordering is to lower the fare paid by the passenger to the airline. *See* Nov. 4–5, 1991 Tr. at 45–46, 76, 154–55, 176–77; PTO ¶ 6(a)(6).

Here, defendants effectuated the fraud by using a fictitious point of travel origin, usually the Solomon Islands, with full knowledge that the passenger's air travel would actually begin in the United States. *See* Nov. 4–5, 1991 Tr. at 82, 95; PTO ¶ (6)(a)(7). Fly & See issued the cross-bordered tickets by first entering into its computer reservation system fictitious segments of travel between the Solomon Islands and the United States, followed by the passenger's actual itinerary. *See* PTO ¶ 6(b)(2). The computer automatically calculated the relevant fare calculations and conversions based upon the country where travel was scheduled to originate, and then printed the ticket. *Id.* Thus, the cost of the entire ticket was calculated using Solomon Islands' currency instead of United States currency.[1] The effect of this scheme was that air fares were materially lower than they would have had been the fictitious points of travel origin not been included in the ticket. *See* Nov. 4–5, 1991 Tr. at 61.

Plaintiffs claim they were damaged by this fraud when other airlines that carried their passengers billed them for this service based upon the actual country of travel origin, the United States, instead of the fictitious country of travel origin, the Solomon Islands. Plaintiffs seek, *inter alia,* the difference between the price paid to these other airlines and the price received from defendants, which being based upon the fictitious point of origin, was substantially less.

## A. *Issuing and Lifting Carriers*

As is common practice in the airline industry, plaintiff airlines, referred to as "issuing carriers," frequently paid other airlines, referred to as "lifting carriers," to transport their passengers, in order to accommodate those passengers flying legs of air travel through cities that plaintiffs did not service.

---

1. The price of the airline tickets at issue here were calculated using Fare Construction Units ("FCUs"), which are currency-neutral calculating units that measure the mileage of a trip. *See* Nov. 4–5, 1991 Tr. at 30, 89, 184, 220. The actual ticket price depends upon the number of FCUs applied to the currency of the country from which a passenger's travel originates. *Id.* at 37, 184.

Pursuant to the Agreement, in order to calculate the appropriate air fare, Fly & See was required to convert the FCUs on all segments of a multi-segment ticket into the currency of the country where a passenger's air travel began. *See id.* at 28, 41; Cathay Amended Complaint ("Cathay Am. Compl.") ¶ 8. This requirement is based on certain international agreements, the object of which is to enable persons in countries with low standards of living to be able to afford to travel. *See* Cathay Am. Compl. ¶ 9. For example, the fare for a ticket from New York to Bombay, India would be calculated using 2000 FCUs. Since the passenger's travel originates in the United States, a country with a relatively strong economy, the 2000 FCUs would be converted by the travel agent into a fare of approximately $2000 U.S. dollars. *See* Nov. 4–5, 1991 Tr. at 36. However, when travel originates in a soft currency country, such as India, a travel agent calculating the air fare for the same trip described above but in reverse, *i.e.* traveling from Bombay to New York, would again use 2000 FCUs but when converted into Indian rupees, the ticket would cost the passenger only 15,000 Indian rupees, which may be worth as little as $500 U.S. dollars. *Id.* at 37. Therefore, in terms of U.S. dollars, the passenger whose travel originates in Bombay is, in fact, paying less for the same trip as his counterpart whose travel originates in the United States. *Id.*

*See* Trial Transcript dated May 9–11, 1994 ("May 9–11, 1994 Tr.") at 50–51. These lifting and issuing carriers belong to the International Air Transport Association ("IATA"), a trade association of over 217 airlines which standardizes ticketing, ground handling and the infrastructure of the airline industry. *See id.* at 21.

Upon booking a flight, Fly & See gave each passenger a flight coupon book, which included flight coupons for each leg of the trip that would be flown. *See* Nov. 4–5, 1991 Tr. at 253; Trial Transcript dated May 9–11, 1994 ("May 9–11, 1994 Tr.") at 114. When a passenger boarded the plane of a lifting carrier airline, the lifting carrier collected the appropriate flight coupon and sent it to its clearinghouse, which would determine how much money the issuing carrier owed to the lifting carrier for transporting the passenger. *See* Nov. 4–5, 1991 Tr. at 264; *see also* May 9–11, 1994 Tr. at 33.

On each ticket, alphabetical and numerical codes allow the airline receiving the bill to determine how the fare was computed. *See* May 9–11, 1994 Tr. 74, 234. In the normal course of interline billings, the lifting carrier's pricing of a particular flight coupon is determined solely from information contained on the face of the ticket. *See id.* at 76. Furthermore, a lifting carrier airline is precluded by agreement from using information other than that contained on the face of the flight coupon to calculate the amount billed. *Id; see infra* at 448.

All relevant lifting carriers provided the IATA with a summary of invoices sent to issuing carrier airlines, and the IATA netted out billings between the carriers. *See* May 9–11, 1994 Tr. at 33–34, 52–53. For example, when amounts owed by Cathay to lifting carriers exceeded amounts payable to Cathay for lifting other airlines' passengers, Cathay transferred this net (excess) amount to its clearinghouse [2] in order to settle its liabilities with other airlines. *See id.* This clearance process took place twelve times per year. *See id.* at 46. Under the IATA rules, plaintiffs had a period of nine months in which to reject any interline billings received from the ARC. *See id.* at 53.

When the lifting carriers became aware of the cross-bordering practice, they sent billing summaries to their clearinghouses which recomputed the cross-bordered ticket prices based upon the currency of the country where travel actually originated, the United States. *See* May 9–11, 1994 Tr. 76. As a result, the IATA debited plaintiffs' accounts for the higher, recomputed ticket price although plaintiffs had only collected the lower, cross-bordered ticket fares from Fly & See. *Id.* at 12, 18–19, 33.

### B. *Relevant IATA Agreements*

The IATA publishes a Revenue Accounting Manual ("RAM") which the airline industry uses to standardize billings between air carriers. *See* May 9–11, 1994 Tr. 37–38. All air carriers in the IATA are contractually bound to follow the procedures outlined in the RAM. *See id.* at 79–80. In effect at all relevant times, RAM section 1.1.1 provided that "the issuing airline's obligation to pay an interline billing from a lifting airline was based on the original information that appears in the fare calculation box on the face of the flight coupon." *Id.* at 59–60. Moreover, pursuant to RAM Section 1.1.1, an issuing carrier airline has the power to refuse a request for a change of fare calculation from a lifting carrier airline except in three, limited circumstances, which plaintiffs' own expert witness testified do not apply to cross-bordering.[3] *See id.* at 62–64, 80.

---

**2.** The International Clearinghouse ("ICH") was Garuda's and Cathay's clearinghouse; American Clearinghouse ("ACH") acted as Hawaiian's clearinghouse. *See* Phillips Dep. 67 (Hawaiian); Deposition of Karen Brug sworn to September 30, 1992 ("Brug Dep."), at 50 (Garuda); Deposition of Gordon Robertson sworn to September 23, 1992 ("Robertson Dep."), at 272 (Cathay).

**3.** Section 1.1.1 of the IATA RAM provides, in relevant part:

An airline may refuse a request for a change of fare calculation points shown on the ticket except:

a) where such a request means a simple repositioning of a fare already mentioned in the fare calculation box from a routing point to which such fare does not apply to a routing point already included in the From/To box to which the fare does apply; or

b) where a refund is made to a passenger. An airline requested to agree to an adjustment of

In addition, all relevant air carriers had entered into the IATA Multiple Interline Traffic Agreement (MITA)[4] to carry other airlines' passengers and interline their baggage. *See* May 9–11, 1994 Tr. at 39. MITA Art. 8 also prevents a lifting carrier airline from using information other than that contained on the face of the flight coupon to calculate the amount billed the issuing carrier airline. *See id.* at 76–77. Further, MITA Article 8.2 specifically incorporates the RAM into the contract between the airline carriers, providing that "billing of [an] amount payable pursuant to the agreement shall be in accordance with the rules contained in the IATA Revenue Accounting Manual." *Id.* at 77–78.

## C. *Plaintiffs' Knowledge of the Fraud*

Plaintiffs became aware of the cross-bordered tickets one to three months after these tickets were issued by defendants—when the lifting carriers requested payment through the ARC clearinghouse. *See* Nov. 4–5, 1991 Tr. at 85–86. Plaintiffs noticed unusual patterns on tickets issued by Fly & See—specifically, that initial legs commencing in soft currency countries always went unused and often were submitted by Fly & See to the ARC for refund, and that travel actually commenced on an intermediate leg of the scheduled air travel, originating within the United States.[5]

In December 1988, after becoming suspicious of Fly & See's ticketing patterns, Cathay revoked Fly & See's authority to issue tickets on its behalf. *See* Nov. 4–5, 1991 Tr. at 99, 150–51; May 9–11, 1994 Tr. at 299–300. Nonetheless, Cathay continued to approve refunds made to Fly & See through January, 1989. *See* Nov. 4–5, 1991 Tr. at 147–9. When Cathay realized the cross-bordering fraud, it tried to recoup the higher fare based

upon the actual country of travel origin by sending additional charges to the credit card holders of the cross-bordered tickets. *See* Nov. 4–5, 1991 Tr. at 116–21. When the credit card holders rejected these charges, Cathay submitted debit memos to Fly & See, which listed the additional amounts owed to Cathay by the travel agency. *See id.* at 119–21. Sometime after April of 1989, Cathay requested the return of refunds made to Fly & See via the ARC. *See* Nov. 4–5, 1991 Tr. at 116, 119–20.

Although in January, 1989, Cathay notified Fly & See in writing that its authority to issue Cathay tickets had been terminated and directed the computer reservations system not to allow Fly & See to validate Cathay tickets, Cathay did not audit any of the Fly & See tickets received thereafter for cross-bordering. *See* Robertson Dep. at 105–07. Rather, Cathay, aware of the cross-bordering fraud, allowed the ARC to pay the lifting carrier airlines the claimed amounts based upon the actual country of travel origin without question. *See id.*

Likewise, although Hawaiian learned about Fly & See's cross-bordered tickets in or about June 1989, it did not reject any Fly & See tickets on the basis of cross-bordering. *See* May 9–11, 1994 Tr. at 212. Instead, Hawaiian paid every bill submitted to it by lifting carrier airlines for segments of cross-bordered tickets issued by Fly & See. *See* May 9–11, 1994 Tr. at 203–04. Testimony at trial revealed that Hawaiian had been aware of the practice of cross-bordering as early as 1988. *See id.* at 211–12.

Garuda claims it was unable to determine on the face of the tickets that they were cross-bordered because the fare listed in the fare construction box on the face of each ticket was correct when compared to the

---

billing may ask for evidence that the refund is being made to the passenger and may refuse the request unless such evidence is produced
. . .
c) where a portion of the routing covered by a single fare component is in breach of the fare construction rules. . . .
*See* Trial Exh. 14.

**4.** The MITA in effect for the years 1988 and 1989 relates to the instant actions. *See* May 9–11, 1994 Tr. at 40–41.

**5.** For example, the first leg of many of the cross-bordered tickets was scheduled for travel from the Solomon Islands to New Guinea and these coupons were never used nor submitted for refund. *See* Nov. 4–5, 1991 Tr. 93–96, 110, 116, 120, 172–75; Brug Dep. 262. Instead, defendants usually submitted the coupon for the second leg of travel, from New Guinea to the continental United States, for refund. *See* Nov. 4–5, 1991 Tr. 90, 172–75, 214–15.

published tariff. *See* Nov. 4–5, 1991 Tr. at 221. Despite Garuda's frequent initial rejections of lifting carriers' recomputed bills for unknown reasons, eventually Garuda paid the higher recomputed amounts to the lifting carrier airlines. *See* May 9–11, 1994 Tr. at 360–62. This practice continued even after Garuda became aware of defendants' cross-bordering practice in April, 1989, *see* May 9–11, 1994 Tr. at 413–14, and subsequently blocked Fly & See's automatic validation through the ticketing system and informed Fly & See by letter of its action. *See* Brug Dep. 256–57.

### D. *Plaintiffs' Damage Claims*

Presently at issue is the amount of damages that defendants owe to plaintiffs. Plaintiffs seek to recover, *inter alia*, the amounts actually paid to the lifting carrier airlines in excess of the monies received from Fly & See for legs of travel on cross-bordered tickets.[6] *See* Plaintiffs' Post–Trial Memorandum ("Pls.' Post–Trial Mem.") dated August 15, 1994, at 5; PTO ¶ 6(b)(3)–(5). Plaintiffs also seek the return of all refunds that were made by them to Fly & See for the unused segments of travel onboard their airplanes. *See* Pls.' Post–Trial Mem. at 6; PTO ¶ 6(b)(3)–(5). Finally, plaintiffs seek the return of commissions paid by them to Fly & See, and any service fees paid by the passengers to defendants for issuing the cross-bordered tickets. *See* Pls.' Post–Trial Mem. at 5; PTO ¶ 6(b)(3)–(5).

### 1. *Cathay*

Cathay asserts that it paid out to lifting carrier airlines $93,370.78 more than it received from Fly & See for cross-bordered tickets. *See* Pls.' Post–Trial Mem. at 6. Ca-

thay also seeks the return of $28,216.56 in refunds which it claims it made to Fly & See for the unused, fictitious segments of Cathay's tickets (from the Solomon Islands to the true United States origination),[7] and $21,819.93 in net commissions that Cathay paid to Fly & See for issuing the cross-bordered tickets. *Id.* at 8. Cathay seeks $430,221.81 in total damages, which is $143,407.27 in claimed damages trebled pursuant to RICO (($93,370.78 + $28,216.56 + $21,819.93) × 3). *Id.* at 24.

### 2. *Hawaiian*

Hawaiian asserts that it paid out to lifting carrier airlines $241,892.92 more than it received from Fly & See for 274 cross-bordered tickets. *See* Pls.' Post–Trial Mem. at 9. In addition, Hawaiian claims that Fly & See submitted and received $108,099.00 in refunds of coupons representing the unused, fictitious segments of the cross-bordered tickets issued by Hawaiian. *Id.* at 10. Further, Hawaiian seeks the return of $56,963.95 in commissions paid to Fly & See for issuing 274 cross-bordered tickets. *Id.* at 11. Hawaiian seeks $1,220,867.61 in total damages, which is $406,955.87 in claimed damages trebled pursuant to RICO (($241,892.92 + $108,099.00 + $56,963.95) × 3). *Id.* at 24.

### 3. *Garuda*

Garuda asserts that it paid out to lifting carrier airlines $71,362.43 more than it received from Fly & See for 55 cross-bordered tickets. *See* Pls.' Post–Trial Mem. at 11. In addition, Garuda seeks the return of $17,523.00 in refunds made to Fly & See on unused, fictitious coupon segments of Garuda's cross-bordered tickets, and $61,907.45 in commissions paid to Fly & See for issuing 298 cross-bordered tickets.[8] *See id.* at 13.

---

**6.** Plaintiffs have waived any claim to amounts not yet paid but which may be owed to lifting carrier airlines. *See* Pls.' Post–Trial Mem. at 6. Consequently, plaintiffs do not seek to recover amounts due to lifting carrier airlines which, to date, have not requested payment based upon Fly & See passengers' true itineraries. None of the lifting carriers have sued any of the plaintiffs to recover amounts due to them, *see* March 13, 1992 Tr. at 37, nor have plaintiffs advised the lifting carriers of the additional sums to which they may have been entitled had the statute of limitations not run. *See id.* at 44.

**7.** The total amount of Cathay's claim for the return of refunds has been decreased in light of the fact that defendants' ARC account would have been debited the eleven percent commission that it received when it initially billed the ticket, at the same time it was credited for the value of the refunded coupon. *See* Pls.' Post–Trial Mem. at 8.

**8.** While Garuda is only claiming damages resulting from having paid out more to lifting carrier airlines than it received from Fly & See for 55 of the 298 cross-bordered tickets issued on its air-

Therefore, Garuda seeks $452,378.64 in total damages, which is $150,792.88 in claimed damages trebled pursuant to RICO (($71,-362.43 + $17,523.00 + $61,907.45) × 3). *See id.* at 24.

In addition to the difference between what was paid to the lifting carriers and what was received from defendants for the cross-bordered tickets, as noted above, plaintiffs also seek the return of refunds [9] and commissions [10] paid through the ARC to defendants, and any service fees paid by Fly $ See's clients to Fly & See under theories of breach of contract, unjust enrichment, conversion, breach of agency, and N.Y.Gen.Bus.L. § 158. *See* PTO ¶ 8(a)(3)–(7).

## DISCUSSION

### I. *PAYMENTS TO LIFTING CARRIERS*

#### A. *Insufficiency of Proof of Damages*

■ The Court finds that plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence and with reasonable specificity the exact amount of their damages incurred as a result of defendants' cross-bordering practice.

With respect to plaintiffs claims for out-of-pocket damages resulting from their paying out to lifting carriers more than what they received from defendants on the cross-bordered tickets, plaintiffs have presented insufficient evidence to allow the Court to distinguish between those Fly & See tickets paid incorrectly as a result of cross-bordering and those paid as a result of other billing errors. *See* May 9–11, 1994 Tr. at 252, 311, 313–15 (Cathay); *id.* at 230 (Hawaiian); *id.* at 360–62 (Garuda). Plaintiffs admit that they have presented only partial evidence with respect to the cross-bordered tickets issued by Fly & See, *see* May 9–11, 1994 Tr. at 141–42, 147–48, 150–51, 230 (Hawaiian); *id.* at 299, 309 (Cathay); *id.* 390–93 (Garuda), some of which is wholly unsupported by competent proof. *See id.* at 275–76. For example, Ca-

line, Garuda is seeking the return of refunds and commissions made with respect to all 298 tickets because it claims all were improperly issued as cross-bordered tickets. *See* Pls.' Post–Trial Mem. at 13, n. 6.

9. Because Fly & See misrepresented its passengers' true itineraries, certain flight coupons remained unused after passengers had completed their air travel (*e.g.,* coupons for air travel between the Solomon Islands and New Guinea, and New Guinea to the United States). *See* Nov. 4–5, 1991 Tr. at 90; PTO ¶ 6(a)(8). Generally, Fly & See submitted cash refund notices to the ARC for refunds from plaintiffs for the unused flight coupons representing the second leg of travel from New Guinea to the United States. *See* Nov. 4–5, 1991 Tr. at 90, 172–75, 214–15. Coupons for the first leg of travel, Solomon Islands to New Guinea, were neither used nor submitted for refund. *See id.* at 93–96, 110, 116, 120, 172–75; Brug Dep. at 262. The ARC then credited Fly & See's account and entered a corresponding debit in the respective plaintiff's ARC account. *See id.* Fly & See received these refunds for their own benefit, rather than for the benefit of its passenger clients, because many of the cross-bordered tickets indicated that payment had been made either by cash, check, or a Fly & See credit card, thus it was impossible for the airline to make a refund directly to the passenger. *See id.; see also* PTO ¶ 6(a)(8)–(9).

Once the ARC submitted these unused flight coupons to plaintiffs, their revenue accounting employees determined the accuracy of the airfare based upon applicable tariffs. *See* Phillips Dep. at 50–61; Terry Dep. at 65–67. As participating carriers, plaintiffs had the right to instruct the ARC not to honor any applications for refunds and could do so retroactively. *See* Phillips Dep. 68, 142. At the end of the period in question, Cathay and Garuda had given the ARC such instructions. However, none of the plaintiffs retroactively rejected any refunds or payments already made on the grounds that the tickets were cross-bordered.

10. Both plaintiffs and defendants received commissions in connection with the cross-bordered tickets. Plaintiffs, as issuing carriers, retained anywhere from eleven (Cathay and Garuda) to twelve (Hawaiian) percent of the total price of each cross-bordered ticket as a commission/service handling fee before making payment to a lifting carrier through the appropriate clearinghouse. *See* May 9–11, 1994 Tr. at 143–44, 148–49 (Hawaiian); *id.* at 262–63 (Cathay); *id.* at 422 (Garuda). In turn, plaintiffs paid out as commissions to defendants roughly eleven percent of the total price of each of the cross-bordered tickets issued by Fly & See. *See* Pls.' Post–Trial Mem. at 8, 11, 13. Generally, travel agents receive a commission when they report a ticket sale to the ARC. *See* May 9–11, 1994 Tr. at 263. The ARC then deducts the travel agent's commission from the fare paid for the ticket before paying over the remainder of the funds to the plaintiff issuing airlines' ARC accounts. *See id.* Thus, defendants paid plaintiffs for the cross-bordered tickets in net funds after defendants had taken their commission. *See id.* at 263–64.

thay could not testify whether or not it received a profit or suffered a loss on some of the cross-bordered tickets which it had purposely excluded from its spreadsheets. *See id.* at 271–72. Further, testimony at trial revealed that Cathay had removed from its spreadsheets some of the profits realized on the cross-bordered tickets by reducing from the amounts paid by defendants to Cathay the cost of uplifting a passenger in U.S. dollars instead of Solomon Islands dollars. *See id.* at 307–88. Moreover, Cathay acknowledged that on some of the tickets, it actually paid less to lifting carriers than it should have, resulting in a "gift" of the profit to Cathay, *see id.* at 311–12, and that it also benefited from over billings. *Id.* at 321–22. Likewise, Hawaiian admitted that it was billed by the lifting carriers for less than it received from defendants for certain cross-bordered flight coupons, see May 9–11, 1994 Tr. at 133–132, 178–80, and sometimes it wasn't billed at all, resulting in a profit. *See id.* at 132–38, 140–41, 161–62.

Further, the spreadsheets prepared by plaintiffs to support their damage claims contained many errors. *See, e.g., id.* at 156 (Hawaiian); *id.* at 311–17 (Cathay); *id.* at 416–438 (Garuda). Moreover, plaintiffs exhibits are a hodge-podge of evidence consisting of interline billings that are neither coherent nor comprehensible enough to establish out-of-pocket loss with respect to amounts paid out to lifting carriers.

### B. *RICO and Fraud claims*

Even if plaintiffs had met their burden and proven damages with reasonable specificity, plaintiffs' RICO and New York common law fraud claims must be dismissed. Although plaintiffs may have paid higher fares to the lifting carrier airlines based upon the actual country of travel origin, while they only received from Fly & See a lower fare based upon a false country of travel origin, the Court finds that plaintiffs have failed to prove that defendants' fraud was the proximate cause of their damages. Because plaintiffs were not obligated under either the RAM and MITA to pay these higher rates to the lifting carrier airlines on the cross-bordered tickets and chose not to challenge those charges under IATA regulations, the Court finds that it was plaintiffs' decision to voluntarily pay the lifting carriers, rather than the defendants' fraud, that was the proximate cause of their injuries.

Both New York law and RICO require proximate causation of damages. *See Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir.1993); *see also, Sperber v. Boesky,* 849 F.2d 60, 64 (2d Cir.1988) ("[a] defendant who violates section 1962 [of RICO] is . . . liable for treble damages . . . to anyone whose injuries were caused 'by reason of' a violation of section 1962") (citations omitted); *Richardson Greenshields Securities Inc. v. Lau,* 819 F.Supp. 1246, 1264 (S.D.N.Y.1993) (one element of a fraud claim under New York law is a misrepresentation "which proximately cause[s] the party seeking relief to suffer a monetary loss").

To establish a common law fraud claim under New York law, "the plaintiff must show that the loss was a 'direct result of the defendant's wrongful actions and [that it was] independent of other causes.'" *Bennett v. United States Trust Co.,* 770 F.2d 308, 316 (2d Cir.1985) (quoting *Idrees v. American Univ. of the Caribbean,* 546 F.Supp. 1342, 1350 (S.D.N.Y.1982)). *See also, Kregos,* 3 F.3d at 665. In other words, plaintiff must prove both transaction and loss causation. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994). Where, as here, "factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant[s'] actions." *Id.*

Under RICO, a "direct relation between the injury asserted and the injurious conduct alleged" is central to a showing of proximate causation. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The Second Circuit further defines the requirements to prove causation, noting that RICO predicate acts "proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural conse-

quence." *Hecht v. Commerce Clearing House Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990).

■ By itself, "but for" causation is not sufficient. *Id.* Rather, plaintiffs must show that defendants' "RICO violation was [a] . . . cause-in-fact of his injury, [as well as] . . . the legal or proximate cause." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994). Therefore, both direct and indirect injuries must be proximately caused by the RICO violation, *see In re Crazy Eddie Securities Litigation*, 714 F.Supp. 1285, 1291 (E.D.N.Y.1989), and the presence of external, supervening factors can interrupt the "causal chain, . . . substantially reducing the certainty with which the loss can be attributed to defendants' conduct." *Fisher v. Reich*, 1995 WL 23966, 1994 U.S. Dist. LEXIS 178121, at * 39 (S.D.N.Y.1994).

■ Based upon evidence presented at trial, Cathay has failed to prove that defendants' fraud was the proximate cause of its damages. Rather, the Court finds that it was Cathay's failure to refuse payments to the lifting carriers, despite its knowledge of defendants' cross-bordering practice, which proximately caused its damages. Cathay paid all bills submitted by the lifting carrier airlines without even questioning the computation of the fares. *See* May 9–11, 1994 Tr. at 250–53, 299. Furthermore, the evidence presented by Cathay at trial is insufficient to permit the Court to discern which Fly & See tickets were incorrectly paid as a result of cross-bordering as opposed to those paid as a result of other billing errors. *See id.* at 252, 313, 315.

This is especially true since although Cathay revoked Fly & See's ability to validate Cathay tickets in November or December 1988, Cathay did not take any steps to review the interline billings from the lifting carriers and/or reject any Fly & See tickets until 1991. *See* May 9–11, 1994 Tr. at 303. Rather, Cathay only checked tickets on a sample

basis to determine whether the airfares were correct. *See* Robertson Dep. at 296. Cathay had no mechanism in place to ensure that it did not pay out more than it billed for a particular ticket. *See id.* at 319.

Hawaiian has also failed to prove that defendants' fraud was the proximate cause of its damages under New York law and RICO. Like Cathay, Hawaiian had the ability to reject cross-bordered tickets, yet failed to do so. *See* May 9–11, 1994 Tr. at 32–34, 118–19. Although cross-bordering was not apparent on the face of the tickets which were processed according to IATA rules, and coupon pricing was determined to be accurate at the time the tickets were checked,[11] *see* May 9–11, 1994 Tr. at 120–21, several factors did indicate cross-bordering on Hawaiian's tickets.

First, Hawaiian tickets lacked the standard gum labeling which is normally used by an issuing carrier's revenue accounting department to determine how that particular ticket was priced by the lifting carrier. *See* May 9–11, 1994 Tr. at 115–16. In addition, although flight and audit coupons should be identical, Hawaiian tickets issued by Fly & See were not, in that handwritten information was added to the auditor's coupon. *See id.* at 213. A comparison of auditor's coupons to flight coupons clearly demonstrated that this handwritten information was later added.[12] *See id.* at 234. Moreover, Hawaiian's own internal auditing system alerted Hawaiian of situations where it paid out more money to a lifting carrier than what it received for a ticket. *See id.* at 128–30. This system enabled Hawaiian to audit its interline billing receipts and to reject those tickets for which it was improperly billed by the lifting carrier. *See id.* at 129–31. Thus, because most cross-bordered tickets would result in Hawaiian paying out more than it received, these tickets were flagged by Hawaiian's own system. *See id.* at 129. Moreover, Hawaiian knew

---

11. When coupons were returned to Hawaiian, revenue accounting agents calculated the amounts of the tickets based on information on the face of the ticket, see Phillips Dep. at 50–61, so as to ascertain that *the travel agent used correct data* in pricing the fares. *See* Terry Dep. at 65–67. Tariffs and proration manuals provided the only mechanisms to check the accuracy of

the computation of the particular fare for a particular coupon. *See* May 9–11, 1994 Tr. at 121.

12. This handwritten information included the currency used for conversion. *See* May 9–11, 1994 Tr. at 213.

about the practice of cross-bordering as early as 1988, *see id.* at 211–12, yet failed to investigate and reject those tickets which its own system showed as irregular. This conduct, the Court concludes, was an intervening factor in the causation of its damages.

Even where Hawaiian did reject some of the Fly & See cross-bordered tickets for various reasons, Hawaiian failed to keep copies of the rejection memos that were sent to the billing airlines. *See* May 9–11, 1994 Tr. at 99, 110, 132, 155–56, 223. Likewise, Hawaiian failed to keep copies of its internal adjustment slips, which reflect adjustments of coupons made during the audit process and the auditor's reasons for rejecting a coupon. *See id.* at 132–33. Moreover, testimony at trial indicated that more than one-half to two-thirds of these tickets were rejected for reasons other than the cross-bordering, *id.* at 230, and there is no way for this Court to determine from the evidence presented at trial exactly how many tickets were rejected on the basis of cross-bordering. *See id.* at 99–101, 225.

Similarly, Garuda was the proximate cause of its own damages under New York law and RICO. Garuda uniformly paid out all of the bills it was sent through the clearinghouse. *See* May 9–11, 1994 Tr. at 360. Although it had stamped some of the Fly & See cross-bordered tickets "rejected," Garuda later canceled the rejections after it discovered that the tickets were cross-bordered and paid the lifting carriers the amounts claimed without questioning the amounts payable. *See id.* at 360 62. Garuda did so even though it was still within the IATA's allotted time period to reject tickets when it learned of defendants' cross-bordering practice. *See id.* at 414–16. Thus, it is Garuda's failure to reject the lifting carrier airlines' calls for higher payments despite its knowledge of defendants' cross-bordering practice that effectively breaks the chain of proximate causation of damages.

From the evidence presented at trial it is clear that plaintiffs could have refused the lifting carriers' requests for a change of fare calculation. Especially damaging is the fact that plaintiffs' own expert witness from the IATA, Mr. Roy Bowes, testified that the three, limited circumstances wherein plaintiffs were contractually precluded from refusing to pay higher fares to lifting carriers do not apply to cross-bordering.[13] *See id.* 62–64. The Court therefore rejects plaintiffs' arguments that they could not reject or refuse to pay the higher, recomputed airfare charged by the lifting carriers. *See* Pls.' Post–Trial Mem. at 18–21. Therefore, the Court finds that plaintiffs have failed to establish under both RICO and New York law that their losses were a proximate result of Fly & See's cross-bordering practice.

■ Plaintiffs also argue that defendants are liable under a theory of equitable subrogation, claiming that plaintiffs' payments to the lifting carriers in excess of what plaintiffs actually received from Fly & See for the cross-bordered tickets resulted in plaintiffs being subrogated to the lifting carrier airlines' rights to recover from defendants the proper fares to which the lifting carriers were entitled. *See* Pls.' Post–Trial Mem. at 21. However, plaintiffs have failed to show that they were compelled to pay the lifting carriers a higher fare. *See In re Chateaugay Corp.,* 89 F.3d 942, 947 (2d. Cir.1996) ("One 'compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other.'") (quoting *American Surety Co. v. Bethlehem Nat'l Bank,* 314 U.S. 314, 317, 62 S.Ct. 226, 86 L.Ed. 241 (1941)). In fact, plaintiffs have relinquished their claims to any monies that may be owed to the lifting carrier airlines which the lifting carriers have not claimed to date. *See supra* n. 6. Moreover, since "the remedy of equitable subrogation arises only when the debt to the creditor or subrogor has been paid in full," *see Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401 (S.D.N.Y.1994) (*citing Thornton v. Syracuse Savings Bank,* 961 F.2d 1042, 1047 (2d Cir.1992)), in light of the speculative nature of plaintiffs' damages, as well as plaintiffs' admissions that they have not advised the lifting carriers of additional sums to which they may have been entitled, *see supra*

13. *See supra* n. 3.

n. 6, the Court simply cannot calculate the full amount of the debt that may have been owed the lifting carriers based upon the evidence presented at trial, and thus cannot find that those obligations were paid in full. Therefore, the Court must reject plaintiffs' equitable subrogation claims.

## II. REFUNDS, COMMISSIONS AND SERVICE FEES

### A. Insufficiency of Proof and Damages

■ Likewise, plaintiffs' request for the return of refunds and commissions paid to defendants and service fees paid by defendants' clients must also fail due to insufficient proof of damages. The morass of exhibits and documentary support submitted by plaintiffs to the Court were neither sufficiently coherent nor comprehensible to establish out-of-pocket loss.

With respect to refunds paid to defendants for the return of unused cross-bordered ticket coupons representing unflown legs of air travel, plaintiffs have failed to provide sufficient proof that they suffered any out-of-pocket pecuniary loss. Plaintiffs neither incurred costs in transporting these passengers nor paid a lifting carrier for that service. Moreover, since defendants generally failed to submit for refund the coupon representing the first leg of travel of each cross-bordered ticket, these amounts are, in effect, windfalls to plaintiff airlines. See supra n. 5.

Similarly, with respect to commissions paid to defendants on the cross-bordered tickets, plaintiffs have failed to establish that they suffered any pecuniary losses. On each cross-bordered ticket, plaintiffs were paid an eleven to twelve percent commission by the lifting carriers based upon the total ticket price, see May 9–11, 1994 Tr. at 143–44, 148–49 (Hawaiian); id. at 262–63 (Cathay); id. at 422 (Garuda); see also supra n. 10, while defendants also received roughly an eleven percent commission based upon the total ticket price. See Pls.' Post Trial Mem. at 8, 11, 13. Therefore, in the overall scheme, plaintiffs merely acted as a conduit for com-

missions paid by the lifting carriers to defendants, see supra n. 10, and thus would receive a windfall should the Court order these commissions returned.[14]

To the extent plaintiffs may have paid commissions to defendants for the first leg of travel that was both unflown and unrefunded, the Record before the Court is bereft of evidence establishing that the amount of commissions paid to defendants on that portion of the ticket exceeded the amount retained by plaintiffs, thereby resulting in a loss. Both Hawaiian and Cathay admitted that on some cross-bordered tickets they received more in commissions from the lifting carriers than what was paid out to defendants as commissions. See May 9–11, 1994 Tr. at 143–46, 149–51 (Hawaiian); 262–263 (Cathay).

Finally, with respect to plaintiffs' claim for any service fees paid to defendants by their clients in return for defendants obtaining a lower airfare through cross-bordering, plaintiffs have failed to submit any evidence from which the Court could conclude that such fees were even paid, let alone their amount. Accordingly, plaintiffs' request is denied.

### B. Common Law Claims

Plaintiffs' unjust enrichment claims, see PTO ¶ 8(a)(4), constructive trust/disgorgement claims, see id. ¶ 8(a)(6), and breach of agency claims, see id. ¶ 8(a)(3), are premised upon the existence of an agency relationship wherein plaintiffs are the principals and defendants their agents, albeit agents who were acting contrary to the interests of their principals. Id. ¶ 8(a)(3). Although plaintiffs claim that said agency was expressly established under the terms of the Agreement, see id. ¶ 6(a)(1)(B), defendants argue that under New York law a travel agent is an independent contractor and "not [an] 'agent[ ]' in the true sense." See Joint Pre–Trial Order filed December 8, 1992 ("Dec.PTO") at ¶ 8(b)(11).

While it appears that New York law is unclear on this issue, compare Spiro v. Pence, 149 Misc.2d 613, 566 N.Y.S.2d 1010, 1011–12 (N.Y.City Ct.1991) (travel agent was

---

**14.** When asked by the Court approximately how much of each commission went towards overhead costs and/or fees associated with handling cross-bordered tickets, a representative from Hawaiian testified that he did not know the amount. See May 9–11, 1994 Tr. at 146, 149–51.

independent contractor and not agent of provider of vacation services even though it received commissions from provider) *with Bucholtz v. Sirotkin Travel, Ltd.,* 80 Misc.2d 333, 363 N.Y.S.2d 415, 416 (N.Y.Sup.Ct.1974) (where no proof of independent relationship between retail travel agent and wholesaler, retail travel agent considered agent of customer); *and Pellegrini v. Landmark Travel Group,* 165 Misc.2d 589, 628 N.Y.S.2d 1003, 1007 (N.Y.City Ct.1995) (travel agent is consumer's agent); *and Fix v. Travel Help,* 143 Misc.2d 673, 541 N.Y.S.2d 924, 925 (Village of Tuckahoe, Small Claims Part 1989) (travel agency acted as traveler's agent); *and Levin v. Kasmir World Travel, Inc.,* 143 Misc.2d 245, 540 N.Y.S.2d 639, 641 (Civ.Ct. City of N.Y., Small Claims Part) (travel agent was fiduciary to traveler); *and Das v. Royal Jordanian Airlines,* 766 F.Supp. 169, 171 (S.D.N.Y.1991) (travel agent was traveler's agent), assuming, *arguendo,* that defendants were plaintiffs' agents, plaintiffs' agency claims must be dismissed because the evidence adduced at trial established that plaintiffs ratified defendants' acts.

 Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge. *See U.S. v. 141st Street Corp. By Hersh,* 911 F.2d 870, 876 (2d Cir.1990), *cert. denied* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991); *see also Maryland Casualty Co. v. Queenan,* 89 F.2d 155, 157 (10th Cir.1937); *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.), *cert. denied,* 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); *Zanoni v. 855 Holding Co., Inc.,* 96 A.D.2d 860, 465 N.Y.S.2d 763, 764 (2d Dep't 1983), *affd.* 62 N.Y.2d 963, 479 N.Y.S.2d 341, 468 N.E.2d 296 (1984); *Marine Midland Bank v. John E. Russo Produce Co., Inc.,* 50 N.Y.2d 31, 44, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980) (citing *Rocky River Devel. Co. v. German American Brewing Co.,* 193 A.D. 197, 184 N.Y.S. 155 (4th Dep't 1920)); 3 Am.Jur.2d Agency § 194–95 (1986); Restatement (Second) Agency § 282 (1984). Here,

the evidence at trial establishes that plaintiffs profited from defendants' cross-bordering. All plaintiffs testified that they had made a profit on some of the cross-bordered tickets as a result of lifting carriers billing them for an amount less than what defendants had paid them, *see* May 9–11, 1994 Tr. at 133–138, 140–41, 161–62, 178–80 (Hawaiian); *id.* at 271–72, 307–88 (Cathay); *id.* at 390–393 (Garuda), and each was paid an eleven percent commission/handling fee by the lifting carriers for processing their interline billings. Furthermore, plaintiffs retained amounts paid by defendants for the first leg of travel on each cross-bordered ticket when that segment was neither flown nor refunded. Thus, New York agency law would bar plaintiffs' attempts to disassociate themselves from defendants' conduct, and plaintiffs' claims based upon a dishonest agent theory therefore must be dismissed.

 Regarding plaintiffs' breach of contract claims, under New York law plaintiffs are only entitled to receive "benefit of the bargain" damages. *See Sager v. Friedman,* 270 N.Y. 472, 481, 1 N.E.2d 971 (1936). Here, whether the fare was computed with either the true or false point of origin, plaintiffs would not have suffered any damages on a contractual theory. Had defendants priced the fare based upon the actual country where travel began (the United States) instead of the Solomon Islands, plaintiffs, as the issuing carriers, would have obtained no additional benefit. In sum, plaintiffs' damages, if any, are simply those damages resulting from allegedly having paid sums to the lifting carriers in excess of those received from defendants, and thus would clearly not be contractual in nature.[15]

 Plaintiffs argument that a private right of action should be implied in N.Y.Gen. Bus.L. § 158 is refuted by the language of the statute itself. New York's Truth in Travel Act explicitly provides that "[t]he *attorney general* or the *district attorney* of any county may bring an action in the name of the people of the state to restrain or prevent any violation of this article or any continu-

---

15. The only conceivable benefit of the bargain damages could consist of higher commissions received from the lifting carriers which, as noted above, would be offset by higher commissions paid to defendants.

ance of any such violation." N.Y.Gen.Bus.L § 159(3) (emphasis added).

██ Finally, plaintiffs' contention that defendants' submission of the unused cross-bordered ticket coupons and plaintiffs' subsequent refund to defendants constitute a conversion of plaintiffs' coupons and monies, must be rejected because of plaintiffs' failure to prove the value of what was allegedly converted. Similarly, plaintiffs' unjust enrichment claims must be dismissed because plaintiffs have failed to prove with specificity the amount of money by which defendants were unjustly enriched at plaintiffs' expense.

## CONCLUSION

For the reasons set forth above, judgment shall be entered for defendants. The Clerk of Court is directed to enter judgment accordingly and to close the above-captioned actions.

It is **SO ORDERED.**