■ SUSAN MIDLER, Respondent, v RICHARD CRANE, M.D., Appellant. [889 NYS2d 149]—

Judgment, Supreme Court, New York County (Eileen Bransten, J.), entered March 19, 2008, upon a jury verdict, awarding plaintiff the principal sums of $500,000 for past pain and suffering and $2,000,000 for future pain and suffering, and bringing up for review an order, same court and Justice, entered December 17, 2007, which denied defendant's post-trial motion to set aside or reduce the verdict, affirmed.

The testimony at the trial of this medical malpractice action established the following relevant facts. Plaintiff's gynecologist referred her to defendant, a rheumatologist, after she began to experience pain in her joints. During her first visit to defendant in October 2000, he administered certain diagnostic tests. One of those tests yielded a false positive result for syphilis, and another showed the presence of an antinuclear antibody. Those two results were significant because they constituted two of the eleven criteria the American College of Rheumatology (ACR) has determined should be used to diagnose lupus erythematosus, which is an autoimmune disease that can affect vital organs. When it involves the kidneys, it is termed lupus nephritis. According to the ACR, a person must have four of the 11 criteria before a definitive diagnosis of lupus can be made. Defendant also performed a urinalysis during the first visit. That test did

not indicate any kidney disorder, which is another of the lupus criteria.

After plaintiff's initial visit, defendant diagnosed her with degenerative arthritis. He wrote a letter in November 2000 to the referring doctor, plaintiff's gynecologist, in which he stated that while plaintiff "lack[ed] the necessary specific criteria for the diagnosis of lupus or connective tissue disease[, c]ontinued monitoring will be required in order to make a more definitive diagnosis should there be any change in her symptom complex."

In February 2001, defendant diagnosed plaintiff with inflammatory arthritis, another of the ACR criteria for lupus. Over the next two years, defendant continued to treat plaintiff for the arthritic condition he had diagnosed. He also performed physical examinations and blood tests on plaintiff. At no time, however, did defendant again do a urinalysis.

In October 2002, plaintiff was experiencing hair loss and visited Dr. Joel Curtis, an endocrinologist. Dr. Curtis performed several tests, including a urinalysis. The urinalysis results were positive for protein, which indicates a renal problem, another of the lupus criteria. Dr. Curtis instructed plaintiff to follow up with Dr. Crane. However, she did not see defendant again until January 2003. Dr. Curtis also directed his secretary to fax the lab results to defendant, but only the endocrine test results were received. Defendant denied ever having received the urinalysis results.

During plaintiff's January 2003 visit to defendant, she complained of swollen feet and ankles. For the first time since plaintiff's initial visit in October 2000, defendant performed a urinalysis. The urinalysis was positive for renal disease, and a biopsy confirmed to defendant that plaintiff had lupus and specifically, lupus nephritis. Defendant prescribed medications, which he told plaintiff would save her kidneys. However, plaintiff discontinued one of the medications and reduced the prescribed dosage of another because of their side effects. Thereafter, plaintiff's kidneys began to fail, requiring five months of dialysis treatment. In December 2003, plaintiff received a kidney transplant.

Plaintiff and defendant each offered the expert testimony of a rheumatologist concerning her treatment. Plaintiff's expert, Dr. Peter Barland, testified that defendant's failure to administer a urinalysis to plaintiff constituted a departure from good medical care because that test was the most effective for detecting kidney problems, one of the lupus criteria. He further testified that defendant should have been closely monitoring for this and other lupus indications because he already knew plaintiff had

exhibited three of the criteria. He stated that urinalysis was a finer and more sensitive method of detecting kidney damage than the creatinine testing performed by defendant. Indeed, Dr. Barland testified that creatinine testing is nonspecific for kidney damage, and is only a preliminary step in discovering renal problems. Defendant's expert, Dr. Allan Gibofsky, testified that it was not necessary for defendant to perform urinalysis because prior to October 2002, plaintiff had exhibited no symptoms indicating possible kidney damage. However, he made clear that urinalysis was necessary to satisfy the renal disorder criteria.

At the charge conference plaintiff proposed a verdict sheet that asked the jury to separately consider whether defendant committed malpractice by failing to diagnose her lupus and/or by failing to properly monitor her for a fourth lupus criterion by the administration of urinalysis. These two questions were consistent with plaintiff's pleadings; in her bill of particulars, she separately alleged those two theories of liability, as follows: "Dr. Crane violated the accepted medical practices, customs and medical standards by failing to diagnose Plaintiff with Latent Lupus despite the clear signs and symptoms that she was suffering from that condition . . . by failing to perform close clinical monitoring of Plaintiff's condition, including the failure to perform the appropriate and necessary lab studies that would have more clearly revealed Plaintiff's condition of systemic Lupus Erythematosus . . . by failing to properly and appropriately follow-up, monitor and investigate Plaintiff's condition . . . by failing to properly diagnose or recognize the deterioration, injury and/or damage that was occurring to Plaintiff's kidneys . . . by failing to perform the proper and appropriate lab tests to recognize the deterioration." Defendant objected to the verdict sheet, arguing it was redundant because, in his view, the failure-to-monitor theory was subsumed within the failure-to-diagnose theory. However, the trial court overruled the objection, stating that plaintiff presented two separate theories at trial and should be entitled to a separate verdict on each theory.

Also at the charge conference, defendant asked the trial court to instruct the jury that it could find for defendant if it determined he had committed an "error in professional judgment." This request was based on defendant's theory that his decision to administer certain diagnostic tests other than urinalysis that he reasonably believed could reveal the presence of lupus was merely an incorrect choice between two viable options. The court declined to charge the jury on that theory, holding that it was not supported by the expert testimony, which

the court viewed as establishing urinalysis as the only reliable diagnostic test for lupus.

The jury rendered a verdict finding that defendant did not depart from good and accepted medical practice in "not diagnosing and treating lupus at any time prior to January 31, 2003" and in "not diagnosing and treating the plaintiff . . . for lupus nephritis at any time between October, 2002 and January 29, 2003." The jury also found that defendant did depart from good and accepted medical practice "in the manner in which he monitored the plaintiff . . . , including not performing urinalysis tests between October 20, 2000 and January 29, 2003," and that this was a substantial factor in causing injury to plaintiff.

The jury decided that Dr. Curtis was negligent in not ensuring that the results of the urinalysis he performed on plaintiff reached defendant, but that this was not a substantial factor in causing plaintiff's injury. The jury also determined that plaintiff herself was negligent in failing to promptly heed Dr. Curtis's instruction that she consult with defendant, and that this was a contributing factor in causing her injury. The jury further decided that plaintiff contributed to her own injury by waiting until February 24, 2003 to see a nephrologist, even though defendant had made that recommendation after diagnosing her with lupus in January 2003. While the jury found that plaintiff's decisions not to take prescribed medications as directed were negligent, it did not find that such negligence contributed to her injuries. The jury apportioned 40% of the responsibility for her injuries to plaintiff herself and the remaining 60% to defendant.

In moving to set aside the verdict, defendant argued that the verdict was inconsistent insofar as it found he was not negligent in failing to diagnose plaintiff's lupus but was negligent in failing to monitor her for additional criteria necessary to make a diagnosis of lupus. He further claimed that the jury's decision that Dr. Curtis failed to properly alert him as to the abnormal urinalysis result in October 2002 but was not responsible for plaintiff's injuries was against the weight of the evidence. Defendant also asserted that plaintiff failed to establish a prima facie case of medical malpractice because his decision to forego urinalysis in favor of different tests was an exercise of medical judgment. Finally, defendant argued that the monetary award to plaintiff was excessive.

In evaluating the arguments of defendant, we must be guided by the principles stated by this Court in *McDermott v Coffee Beanery, Ltd.* (9 AD3d 195, 206 [2004]): "[I]n the absence of indications that substantial justice has not been done, a success-

ful litigant is entitled to the benefits of a favorable jury verdict. Indeed, the court must cautiously balance the great deference to be accorded to the jury's conclusion . . . against the court's own obligation to assure that the verdict is fair, and the court may not employ its discretion simply because it disagrees with a verdict, as this would unnecessarily interfere with the fact-finding function of the jury to a degree that amounts to an usurpation of the jury's duty" (internal quotation marks and citations omitted).

The jury's determination that defendant committed malpractice by failing to monitor plaintiff for the development of lupus was not inconsistent with its finding that he was not negligent in failing to diagnose and treat plaintiff for lupus. An inconsistency in a verdict exists "only when a verdict on one claim necessarily negates an element of another cause of action" (*Barry v Manglass*, 55 NY2d 803, 805 [1981]). Here, the verdict that defendant failed to diagnose lupus does not negate any element of the verdict that defendant failed to monitor plaintiff. The jury could reasonably have found, based on the evidence presented, that defendant could not have made a lupus diagnosis based on the tests he did administer to plaintiff, because there was no evidence that in June 2002, the last time he performed any tests, plaintiff had a problem with her kidney. At the same time, and on the same evidence, it could reasonably have found that defendant failed in his obligation to continue administering the tests that would have eventually permitted the diagnosis. There was strong evidence, the results of the urinalysis performed by Dr. Curtis, that plaintiff had kidney damage in October 2002. Therefore, the jury would have been justified in determining that had defendant performed a urinalysis around that time, he would have diagnosed plaintiff with lupus and specifically, lupus nephritis, in time to treat the disease and prevent kidney loss.

The holding in *McPhillips v Herzig* (172 AD2d 427 [1991]), relied on by defendant and the dissent, does not affect this analysis. In that case, the plaintiff visited the defendant doctor upon experiencing acute abdominal pain. The doctor diagnosed her with pelvic inflammatory disease without doing a pelvic examination. Six days later the plaintiff was admitted to a hospital, where it was determined that the initial pain was caused by diverticulitis of the sigmoid colon, which the defendant would have discovered had he performed a pelvic exam. After trial, a jury found the defendant negligent in failing to perform the pelvic examination when the plaintiff was in his office. However, the jury also found the defendant not negligent in failing to make a correct diagnosis and institute appropriate treatment.

This Court remanded for a new trial based in part on what it determined was an inconsistent verdict.

*McPhillips* is distinguishable because, on the facts of that case, it was impossible for the jury to separate the failure to diagnose from the failure to monitor. The defendant's malpractice occurred in one single act of omission. In one office visit, the defendant failed to diagnose an actual illness or condition the plaintiff had at the time, because he failed to carry out a particular diagnostic procedure. Here, in contrast, the facts were such that the jury could reasonably have viewed the failure-to-monitor theory as diverging from the failure-to-diagnose theory after plaintiff's visit in June 2002, the last time defendant administered diagnostic tests. In contrast to *McPhillips*, the evidence at trial did not establish that plaintiff had lupus at that time. The evidence clearly established, however, that defendant had a continuing obligation to test for a fourth lupus criterion. Therefore, the jury could reasonably have determined that the failure-to-diagnose theory fell by the wayside in June 2002, but that defendant had the continuing duty to monitor plaintiff, and thus the failure-to-monitor theory of liability was applicable. Even defendant, as early as his letter of November 6, 2000 to plaintiff's gynecologist, recognized this duty when he wrote that "[c]ontinued monitoring will be required in order to make a more definitive diagnosis should there be any change in [plaintiff's] symptom complex."

Nor is the jury's finding that Dr. Curtis was negligent in not imparting to defendant the results of the urinalysis he performed on plaintiff inconsistent with its finding that this was not a substantial factor in causing plaintiff's injuries. The issue of Dr. Curtis's negligence was not inextricably intertwined with the issue of proximate cause such that the former could not exist without the latter (*see Brown v New York City Tr. Auth.*, 50 AD3d 377 [2008]). For example, the jury could reasonably have believed that defendant, being the physician in the better position to have diagnosed lupus in time to successfully treat it, was solely responsible for ensuring that the proper diagnostic tests were administered (*see Ledogar v Giordano*, 122 AD2d 834, 836-837 [1986]).

Further, plaintiff established her prima facie entitlement to judgment by presenting expert evidence that urinalysis was the most appropriate method for diagnosing lupus in this case. Defendant had suspected lupus as early as plaintiff's first visit with him, and acknowledged to her gynecologist that monitoring for the disease was necessary. The trial court did not err by refusing to charge the jury on the professional judgment doc-

trine. Nor was the jury's verdict against the weight of the evidence, since based on the expert testimony, both the court and the jury would have been justified in concluding that urinalysis was the most direct method for diagnosing kidney damage. Indeed, considering that strong signs of lupus existed at the very outset of plaintiff's treatment, the trial court and the jury appropriately found that defendant had an obligation to take all available diagnostic measures, including urinalysis. Since urinalysis was the most relevant test, the court and the jury could reasonably have found that defendant's failure to perform urinalysis was malpractice per se, and not merely a choice among medically acceptable alternatives (*see Nestorowich v Ricotta*, 97 NY2d 393, 399 [2002]).

Finally, the awards for past and future pain and suffering do not deviate materially from what would be reasonable compensation under the circumstances (CPLR 5501 [c]). Concur—Mazzarelli, J.P., Nardelli and Richter, JJ.

Sweeny and Freedman, JJ., dissent in a memorandum by Sweeny, J., as follows: Because the jury's finding that defendant departed from good and accepted medical practice in failing to monitor plaintiff for lupus was inconsistent with its finding that there was no such departure in failing to diagnose and treat her for that disease, I must dissent.

Plaintiff was referred to defendant, a board certified rheumatologist, by her gynecologist, Dr. Grossman, in October 2000. At that time, she complained of pain in her knees, wrists and ankles. After reviewing plaintiff's lab results, defendant performed a urinalysis in order to check for possible kidney disease. The test results revealed normal findings, thus presenting no evidence of kidney disease. Defendant diagnosed plaintiff at that time with degenerative arthritis.

Defendant sent a letter to Dr. Grossman, dated November 6, 2000, in which he stated: "Laboratory tests indicate a positive ANA although patient lacks the necessary specific criteria for the diagnosis of lupus or connective tissue disease. Continued monitoring will be required in order to make a more definitive diagnosis should there be any change in her symptom complex."

Defendant treated plaintiff for inflammatory arthritis in 2001 and 2002. He performed physical evaluations and blood testing, and continued to monitor plaintiff for signs of lupus. During this time he did not perform further urinalysis.

In October 2002, plaintiff saw Dr. Joel Curtis, an endocrinologist, with complaints of hair loss. Dr. Curtis attributed this condition to the type of shampoo plaintiff was using. As part of his examination, he conducted a urinalysis. The results were

abnormal, and he instructed plaintiff to return to defendant for follow-up care.

Dr. Curtis testified at trial that he directed his secretary to send the abnormal urinalysis results to defendant. His secretary testified at her exam before trial that she believed she faxed all six pages of plaintiff's lab results to defendant.

In November 2002, plaintiff sent a fax to defendant advising him that she stopped taking her arthritis medication, she was feeling better, that her hair was growing back, and that her recovery was "a miracle."

In early 2003, plaintiff made an appointment to see defendant, who conducted examinations on January 23 and 29. At those appointments, defendant performed a blood test and urinalysis. Based upon those test results and his examination, defendant diagnosed plaintiff with renal disease, pending the results of a biopsy to confirm his suspicion that plaintiff had lupus. He prescribed medication for plaintiff, and on January 29 he directed plaintiff to consult with a nephrologist.

On March 20, 2003, plaintiff sent defendant a fax stating that she wished to discontinue her Cytoxan medication because she was concerned about her hair loss. Plaintiff took this step despite the fact that she had been told that the Cytoxan would save her kidneys. Defendant then prescribed Imuran and Prednisone, which plaintiff self-tapered because of its effects on her face.

In June 2003, plaintiff was hospitalized for kidney failure and underwent five months of dialysis. In December 2003, she underwent kidney transplant surgery.

At trial, defendant testified that there are 11 criteria set forth by the American College of Rheumatology for a diagnosis of lupus. The presence of any four of those criteria indicates the patient has lupus.

The lab tests from plaintiff's first visit on October 2000 showed a high ANA and false positive syphilis test, which are two of the 11 criteria. Defendant's diagnosis of inflammatory arthritis in February 2001 constituted a third criterion. Defendant acknowledged that he had a responsibility to continue to monitor plaintiff for the fourth criterion, which he stated he did by blood testing.

Defendant testified that he received a two-page fax from Dr. Curtis, but those pages were endocrine test results and did not contain any information regarding abnormal urinalysis test results. He also stated that until January 2003, plaintiff did not show any symptoms that would have necessitated further urinalysis.

Plaintiff testified that she called defendant a number of times to ensure he had received Dr. Curtis's test results. She sent defendant a fax on October 30, 2002, asking him to call her after reviewing those results. In that fax, she stated: "Dr. Curtis informed me that . . . the cause of the problem is not related to the endocrine system. Could the problem of the hair loss have been the Minocin medication?" This is consistent with defendant's testimony that he received only a two-page fax report concerning endocrine test results from Dr. Curtis. Neither plaintiff's fax nor the two pages defendant testified he received from Dr. Curtis mentioned anything about a urinalysis.

Plaintiff also testified that defendant told her to see an nephrologist on January 29, 2003, but she did not see one until she returned from her vacation to Hawaii on February 20.

Plaintiff's experts testified that defendant should have performed frequent urinalyses because he should have suspected that plaintiff had lupus. They opined that blood testing, as defendant had been doing, was not the correct way to detect kidney disease. Moreover, plaintiff's expert rheumatologist testified that there are situations where a patient presents enough characteristic findings of lupus that the treating doctor need not wait until the fourth criterion presents itself in order to diagnose lupus. One expert stated, however, that the testing performed by defendant in June 2002 did not evidence any signs of kidney disease.

Defendant's rheumatology expert testified that urinalysis was not required until January 2003, when plaintiff showed specific signs of kidney disease. He also testified that blood testing was appropriate, and there was no indication in the laboratory findings up to August 2002 that required urinalysis. He opined that had urinalysis testing been performed in the summer of 2002, the results would likely have been normal.

Defendant objected to the verdict sheet proposed by plaintiff, which required specific answers for multiple interrogatories. These interrogatories were based on two theories—one being the failure to timely diagnose lupus and the other being the failure to properly monitor plaintiff's condition, specifically by failing to conduct further urinalysis. Defendant argued that the failure to monitor and failure to diagnose were two overlapping theories and would result in inconsistent verdicts. He instead sought a verdict sheet asking whether defendant had departed from good and accepted medical practice in failing to diagnose lupus prior to January 2003. The court ruled that the two issues were "related, but I do think they're separate" and submitted the plaintiff's proposed verdict sheet to the jury.

The jury found that defendant did not depart from good and accepted medical practice "in not diagnosing and treating lupus at any time prior to January 31, 2003" (interrogatory 1 [a]) and "in not diagnosing and treating . . . lupus nephritis at any time between October, 2002 and January 29, 2003" (interrogatory 3 [a]). The jury did find, however, that defendant departed from good and accepted medical practice in his monitoring of plaintiff, including not performing urinalysis tests between October 20, 2000 and January 29, 2003 (interrogatory 2 [a]) and that this departure was a substantial factor in causing plaintiff's injuries (interrogatory 2 [b]).

The jury also found that nonparty Dr. Curtis departed from good and accepted medical practice by not ensuring that defendant actually received the abnormal urinalysis results of October 2002 (interrogatory 5 [a]) and by not including those results in his consult letter of November 6, 2002 which was forwarded to Dr. Grossman (interrogatory 6 [a]), but that these departures were not a substantial factor in causing injury to plaintiff (interrogatories 5 [b]; 6 [b]).

As to plaintiff, the jury determined she was negligent in not returning to defendant's office prior to January 23, 2003 after being directed to do so by Dr. Curtis in October 2002 (interrogatory 7 [a]), and further negligent when she did not consult with a nephrologist until February 24, 2003 (interrogatory 8 [a]) and that both instances of negligence were substantial factors in causing her injuries (interrogatories 7 [b]; 8 [b]). Plaintiff was further found to be negligent in discontinuing her Cytoxan medication (interrogatory 9 [a]) and in self-tapering her Prednisone medication in April and May 2003 (interrogatory 10 [a]) although the jury found this negligence was not a substantial factor in causing her injury (interrogatories 9 [b]; 10 [b]).

Where a jury's responses to interrogatories "are inconsistent with each other and one or more is inconsistent with the general verdict," the trial court's options are to order either reconsideration by the jury or a new trial (CPLR 4111 [c]). These statutory alternatives are the only available options under those circumstances (*Marine Midland Bank v Russo Produce Co.*, 50 NY2d 31, 40 [1980]; *Sobie v Katz Constr. Corp.*, 189 AD2d 49, 53 [1993]).

An examination of the jury's answers to the interrogatories demonstrates an inconsistency that mandates a new trial. The jury's finding in interrogatory 2 (a) that defendant departed from good and accepted medical practice in not monitoring plaintiff's condition, including not performing urinalysis testing from October 20, 2000 through January 29, 2003, is inconsis-

tent with its findings that there was no departure in diagnosing and treating plaintiff for lupus prior to January 31, 2003 (interrogatory 1 [a]) or at any time between October 2002 and January 29, 2003 (interrogatory 3 [a]). The finding that there was no departure in defendant's failure to diagnose at any time covers the same period in which defendant was found to have departed from accepted practice in failing to monitor plaintiff's condition. Such monitoring is not merely "related" to the diagnosis question, as the trial court found, but is, as defendant argued, part and parcel of the diagnosis process. Indeed, plaintiff's experts opined that urinalysis was the only proper way to make an early diagnosis of lupus, i.e., before the disease had progressed so far as to have an irreversible impact on the patient's kidneys. Thus, for the jury to conclude that defendant did not depart from accepted practice in failing to diagnose lupus at any time prior to January 2003, it could not have consistently found that his failure to conduct urinalysis testing in order to promptly arrive at his diagnosis was a departure from accepted medical practice during part of that time frame.

In addition, the jury finding that nonparty Dr. Curtis departed from good and accepted medical practice by not ensuring that defendant received the abnormal findings of the urinalysis conducted by him on October 3, 2002 (interrogatory 5 [a]) but that this was not a substantial factor in causing plaintiff's injury (interrogatory 5 [b]) is inconsistent with the findings relating to defendant. Dr. Curtis was found to have departed from accepted practice during the same period that the jury found defendant also departed from the standard in failing to monitor plaintiff's condition. Yet the jury inexplicably found defendant's departure to be a cause of plaintiff's injuries while at the same time finding that Dr. Curtis's departure was not. This inconsistency cannot be explained by a reasonable view of the evidence submitted at trial.

The interrogatories and issues here are strikingly similar to those submitted to the jury in *McPhillips v Herzig* (172 AD2d 427 [1991]). *McPhillips* involved theories of medical malpractice predicated, as here, on failure to diagnose and failure to monitor. The *McPhillips* jury found the defendant physician did not depart from good and accepted medical standards of treatment in failing to diagnose and treat the disease condition in question, i.e., diverticulitis of the sigmoid colon. However, it also found the defendant did depart from such standard in failing to perform a pelvic exam, which was a specific diagnostic test used to diagnose the plaintiff's condition. We held that the special verdict was "inconsistent [in] finding both that defendant was

negligent in failing to do a pelvic examination and then responding 'no' to the question[:] 'Was defendant negligent in failing to make a correct diagnosis and institute appropriate treatment . . . ?' " (*Id.* at 428.)

While the facts of *McPhillips* differ slightly, the principle remains the same. I cannot agree with the majority statement that in *McPhillips* "it was impossible for the jury to separate the failure to diagnose from the failure to monitor." It is true that the malpractice in *McPhillips* occurred in one office visit, as opposed to here, where it took place over a period of time. However, both juries found the respective defendants liable for failing to conduct specific diagnostic tests, but not liable for failing to diagnose the condition that the test was designed to identify.

I do not dispute the majority's conclusion that defendant had a duty to monitor plaintiff's condition. I must take issue however, with the conclusion that "the jury could reasonably have viewed the failure-to-monitor theory as diverging from the failure-to-diagnose theory," especially since, at the time of the first diagnostic testing, plaintiff exhibited three markers for lupus, a situation that was certainly serious enough to warrant further monitoring and testing, which was not done here.

Nor can I agree with the majority's conclusion that the jury's determination that Dr. Curtis's negligence in not imparting to defendant the results of the urinalysis he performed on plaintiff is not inconsistent with its finding that such negligence was not a substantial factor in causing plaintiff's injuries. This conclusion assumes that defendant knew he only received a partial set of lab results. His testimony at trial was that plaintiff showed no symptoms warranting further urinalysis until January 2003; Dr. Curtis's examination took place in October 2002, so defendant would have had no reason to assume that Dr. Curtis performed a urinalysis test. While the majority faults defendant for not making further inquiry into Dr. Curtis's examination, based upon his testimony, it is apparent that he had no reason to make such inquiry.

In short, the verdicts are fatally inconsistent. As a result, the judgment should be vacated, the order denying defendant's motion for a new trial should be reversed, and the motion granted.